252 U.S. 189 (1920)
EISNER, AS COLLECTOR OF UNITED STATES INTERNAL REVENUE FOR THE THIRD DISTRICT OF THE STATE OF NEW YORK,
v.
MACOMBER.
No. 318.
Supreme Court of United States.
Argued April 16, 1919.
Reargument May 19, 1919.
Reargued October 17, 20, 1919.
Decided March 8, 1920.
ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.
*190 Mr. Assistant Attorney General Frierson for plaintiff in error.
Mr. Charles E. Hughes, with whom Mr. George Welwood Murray was on the briefs, for defendant in error.
Mr. George W. Wickersham and Mr. Charles Robinson Smith, by leave of court, filed a brief as amici curiae:
Restored to docket for reargument May 19, 1919.
*199 MR. JUSTICE PITNEY delivered the opinion of the court.
This case presents the question whether, by virtue of the Sixteenth Amendment, Congress has the power to tax, as income of the stockholder and without apportionment, a stock dividend made lawfully and in good faith against profits accumulated by the corporation since March 1, 1913.
It arises under the Revenue Act of September 8, 1916, c. 463, 39 Stat. 756, et seq., which, in our opinion (notwithstanding a contention of the Government that will be *200 noticed), plainly evinces the purpose of Congress to tax stock dividends as income.[1]
The facts, in outline, are as follows:
On January 1, 1916, the Standard Oil Company of California, a corporation of that State, out of an authorized capital stock of $100,000,000, had shares of stock outstanding, par value $100 each, amounting in round figures to $50,000,000. In addition, it had surplus and undivided profits invested in plant, property, and business and required for the purposes of the corporation, amounting to about $45,000,000, of which about $20,000,000 had been earned prior to March 1, 1913, the balance thereafter. In January, 1916, in order to readjust the capitalization, the board of directors decided to issue additional shares sufficient to constitute a stock dividend of 50 per cent. of the outstanding stock, and to transfer from surplus account to capital stock account an amount equivalent to such issue. Appropriate resolutions were adopted, an amount equivalent to the par value of the proposed new stock was transferred accordingly, and the new stock duly issued against it and divided among the stockholders.
Defendant in error, being the owner of 2,200 shares of the old stock, received certificates for 1,100 additional *201 shares, of which 18.07 per cent., or 198.77 shares, par value $19,877, were treated as representing surplus earned between March 1, 1913, and January 1, 1916. She was called upon to pay, and did pay under protest, a tax imposed under the Revenue Act of 1916, based upon a supposed income of $19,877 because of the new shares; and an appeal to the Commissioner of Internal Revenue having been disallowed, she brought action against the Collector to recover the tax. In her complaint she alleged the above facts, and contended that in imposing such a tax the Revenue Act of 1916 violated Art. I, § 2, cl. 3, and Art. I, § 9, cl. 4, of the Constitution of the United States, requiring direct taxes to be apportioned according to population, and that the stock dividend was not income within the meaning of the Sixteenth Amendment. A general demurrer to the complaint was overruled upon the authority of Towne v. Eisner, 245 U.S. 418; and, defendant having failed to plead further, final judgment went against him. To review it, the present writ of error is prosecuted.
The case was argued at the last term, and reargued at the present term, both orally and by additional briefs.
We are constrained to hold that the judgment of the District Court must be affirmed: First, because the question at issue is controlled by Towne v. Eisner, supra; secondly, because a reexamination of the question, with the additional light thrown upon it by elaborate arguments, has confirmed the view that the underlying ground of that decision is sound, that it disposes of the question here presented, and that other fundamental considerations lead to the same result.
In Towne v. Eisner, the question was whether a stock dividend made in 1914 against surplus earned prior to January 1, 1913, was taxable against the stockholder under the Act of October 3, 1913, c. 16, 38 Stat. 114, 166, which provided (§ B, p. 167) that net income should include "dividends," and also "gains or profits and income derived *202 from any source whatever." Suit having been brought by a stockholder to recover the tax assessed against him by reason of the dividend, the District Court sustained a demurrer to the complaint. 242 Fed. Rep. 702. The court treated the construction of the act as inseparable from the interpretation of the Sixteenth Amendment; and, having referred to Pollock v. Farmers' Loan & Trust Co., 158 U.S. 601, and quoted the Amendment, proceeded very properly to say (p. 704): "It is manifest that the stock dividend in question cannot be reached by the Income Tax Act, and could not, even though Congress expressly declared it to be taxable as income, unless it is in fact income." It declined, however, to accede to the contention that in Gibbons v. Mahon, 136 U.S. 549, "stock dividends" had received a definition sufficiently clear to be controlling, treated the language of this court in that case as obiter dictum in respect of the matter then before it (p. 706), and examined the question as res nova, with the result stated. When the case came here, after overrulling a motion to dismiss made by the Government upon the ground that the only question involved was the construction of the statute and not its constitutionality, we dealt upon the merits with the question of construction only, but disposed of it upon consideration of the essential nature of a stock dividend, disregarding the fact that the one in question was based upon surplus earnings that accrued before the Sixteenth Amendment took effect. Not only so, but we rejected the reasoning of the District Court, saying (245 U.S. 426): "Notwithstanding the thoughtful discussion that the case received below we cannot doubt that the dividend was capital as well for the purposes of the Income Tax Law as for distribution between tenant for life and remainderman. What was said by this court upon the latter question is equally true for the former. `A stock dividend really takes nothing from the property of the corporation, and adds nothing to the *203 interests of the shareholders. Its property is not diminished, and their interests are not increased. . . . The proportional interest of each shareholder remains the same. The only change is in the evidence which represents that interest, the new shares and the original shares together representing the same proportional interest that the original shares represented before the issue of the new ones.' Gibbons v. Mahon, 136 U.S. 549, 559, 560. In short, the corporation is no poorer and the stockholder is no richer than they were before. Logan County v. United States, 169 U.S. 255, 261. If the plaintiff gained any small advantage by the change, it certainly was not an advantage of $417,450, the sum upon which he was taxed. . . . What has happened is that the plaintiff's old certificates have been split up in effect and have diminished in value to the extent of the value of the new."
This language aptly answered not only the reasoning of the District Court but the argument of the Solicitor General in this court, which discussed the essential nature of a stock dividend. And if, for the reasons thus expressed, such a dividend is not to be regarded as "income" or "dividends" within the meaning of the Act of 1913, we are unable to see how it can be brought within the meaning of "incomes" in the Sixteenth Amendment; it being very clear that Congress intended in that act to exert its power to the extent permitted by the Amendment. In Towne v. Eisner it was not contended that any construction of the statute could make it narrower than the constitutional grant; rather the contrary.
The fact that the dividend was charged against profits earned before the Act of 1913 took effect, even before the Amendment was adopted, was neither relied upon nor alluded to in our consideration of the merits in that case. Not only so, but had we considered that a stock dividend constituted income in any true sense, it would have been held taxable under the Act of 1913 notwithstanding it was *204 based upon profits earned before the Amendment. We ruled at the same term, in Lynch v. Hornby, 247 U.S. 339, that a cash dividend extraordinary in amount, and in Peabody v. Eisner, 247 U.S. 347, that a dividend paid in stock of another company, were taxable as income although based upon earnings that accrued before adoption of the Amendment. In the former case, concerning "corporate profits that accumulated before the Act took effect," we declared (pp. 343-344): "Just as we deem the legislative intent manifest to tax the stockholder with respect to such accumulations only if and when, and to the extent that, his interest in them comes to fruition as income, that is, in dividends declared, so we can perceive no constitutional obstacle that stands in the way of carrying out this intent when dividends are declared out of a pre-existing surplus. . . . Congress was at liberty under the Amendment to tax as income, without apportionment, everything that became income, in the ordinary sense of the word, after the adoption of the Amendment, including dividends received in the ordinary course by a stockholder from a corporation, even though they were extraordinary in amount and might appear upon analysis to be a mere realization in possession of an inchoate and contingent interest that the stockholder had in a surplus of corporate assets previously existing." In Peabody v. Eisner (pp. 349-350), we observed that the decision of the District Court in Towne v. Eisner had been reversed "only upon the ground that it related to a stock dividend which in fact took nothing from the property of the corporation and added nothing to the interest of the shareholder, but merely changed the evidence which represented that interest;" and we distinguished the Peabody Case from the Towne Case upon the ground that "the dividend of Baltimore & Ohio shares was not a stock dividend but a distribution in specie of a portion of the assets of the Union Pacific."
Therefore, Towne v. Eisner cannot be regarded as turning *205 upon the point that the surplus accrued to the company before the act took effect and before adoption of the Amendment. And what we have quoted from the opinion in that case cannot be regarded as obiter dictum, it having furnished the entire basis for the conclusion reached. We adhere to the view then expressed, and might rest the present case there; not because that case in terms decided the constitutional question, for it did not; but because the conclusion there reached as to the essential nature of a stock dividend necessarily prevents its being regarded as income in any true sense.
Nevertheless, in view of the importance of the matter, and the fact that Congress in the Revenue Act of 1916 declared (39 Stat. 757) that a "stock dividend shall be considered income, to the amount of its cash value," we will deal at length with the constitutional question, incidentally testing the soundness of our previous conclusion.
The Sixteenth Amendment must be construed in connection with the taxing clauses of the original Constitution and the effect attributed to them before the Amendment was adopted. In Pollock v. Farmers' Loan & Trust Co., 158 U.S. 601, under the Act of August 27, 1894, c. 349, § 27, 28 Stat. 509, 553, it was held that taxes upon rents and profits of real estate and upon returns from investments of personal property were in effect direct taxes upon the property from which such income arose, imposed by reason of ownership; and that Congress could not impose such taxes without apportioning them among the States according to population, as required by Art. I, § 2, cl. 3, and § 9, cl. 4, of the original Constitution.
Afterwards, and evidently in recognition of the limitation upon the taxing power of Congress thus determined, the Sixteenth Amendment was adopted, in words lucidly expressing the object to be accomplished: "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among *206 the several States, and without regard to any census or enumeration." As repeatedly held, this did not extend the taxing power to new subjects, but merely removed the necessity which otherwise might exist for an apportionment among the States of taxes laid on income. Brushaber v. Union Pacific R.R. Co., 240 U.S. 1, 17-19; Stanton v. Baltic Mining Co., 240 U.S. 103, 112 et seq.; Peck & Co. v. Lowe, 247 U.S. 165, 172-173.
A proper regard for its genesis, as well as its very clear language, requires also that this Amendment shall not be extended by loose construction, so as to repeal or modify, except as applied to income, those provisions of the Constitution that require an apportionment according to population for direct taxes upon property, real and personal. This limitation still has an appropriate and important function, and is not to be overridden by Congress or disregarded by the courts.
In order, therefore, that the clauses cited from Article I of the Constitution may have proper force and effect, save only as modified by the Amendment, and that the latter also may have proper effect, it becomes essential to distinguish between what is and what is not "income," as the term is there used; and to apply the distinction, as cases arise, according to truth and substance, without regard to form. Congress cannot by any definition it may adopt conclude the matter, since it cannot by legislation alter the Constitution, from which alone it derives its power to legislate, and within whose limitations alone that power can be lawfully exercised.
The fundamental relation of "capital" to "income" has been much discussed by economists, the former being likened to the tree or the land, the latter to the fruit or the crop; the former depicted as a reservoir supplied from springs, the latter as the outlet stream, to be measured by its flow during a period of time. For the present purpose we require only a clear definition of the term "income," *207 as used in common speech, in order to determine its meaning in the Amendment; and, having formed also a correct judgment as to the nature of a stock dividend, we shall find it easy to decide the matter at issue.
After examining dictionaries in common use (Bouv. L.D.; Standard Dict.; Webster's Internat. Dict.; Century Dict.), we find little to add to the succinct definition adopted in two cases arising under the Corporation Tax Act of 1909 (Stratton's Independence v. Howbert, 231 U.S. 399, 415; Doyle v. Mitchell Bros. Co., 247 U.S. 179, 185)  ""Income may be defined as the gain derived from capital, from labor, or from both combined," provided it be understood to include profit gained through a sale or conversion of capital assets, to which it was applied in the Doyle Case (pp. 183, 185).
Brief as it is, it indicates the characteristic and distinguishing attribute of income essential for a correct solution of the present controversy. The Government, although basing its argument upon the definition as quoted, placed chief emphasis upon the word "gain," which was extended to include a variety of meanings; while the significance of the next three words was either overlooked or misconceived. "Derived  from  capital;"  "the gain  derived  from  capital," etc. Here we have the essential matter: not a gain accruing to capital, not a growth or increment of value in the investment; but a gain, a profit, something of exchangeable value proceeding from the property, severed from the capital however invested or employed, and coming in, being "derived," that is, received or drawn by the recipient (the taxpayer) for his separate use, benefit and disposal;  that is income derived from property. Nothing else answers the description.
The same fundamental conception is clearly set forth in the Sixteenth Amendment  "incomes, from whatever source derived"  the essential thought being expressed *208 with a conciseness and lucidity entirely in harmony with the form and style of the Constitution.
Can a stock dividend, considering its essential character, be brought within the definition? To answer this, regard must be had to the nature of a corporation and the stockholder's relation to it. We refer, of course, to a corporation such as the one in the case at bar, organized for profit, and having a capital stock divided into shares to which a nominal or par value is attributed.
Certainly the interest of the stockholder is a capital interest, and his certificates of stock are but the evidence of it. They state the number of shares to which he is entitled and indicate their par value and how the stock may be transferred. They show that he or his assignors, immediate or remote, have contributed capital to the enterprise, that he is entitled to a corresponding interest proportionate to the whole, entitled to have the property and business of the company devoted during the corporate existence to attainment of the common objects, entitled to vote at stockholders' meetings, to receive dividends out of the corporation's profits if and when declared, and, in the event of liquidation, to receive a proportionate share of the net assets, if any, remaining after paying creditors. Short of liquidation, or until dividend declared, he has no right to withdraw any part of either capital or profits from the common enterprise; on the contrary, his interest pertains not to any part, divisible or indivisible, but to the entire assets, business, and affairs of the company. Nor is it the interest of an owner in the assets themselves, since the corporation has full title, legal and equitable, to the whole. The stockholder has the right to have the assets employed in the enterprise, with the incidental rights mentioned; but, as stockholder, he has no right to withdraw, only the right to persist, subject to the risks of the enterprise, and looking only to dividends for his return. If he desires to dissociate himself *209 from the company he can do so only by disposing of his stock.
For bookkeeping purposes, the company acknowledges a liability in form to the stockholders equivalent to the aggregate par value of their stock, evidenced by a "capital stock account." If profits have been made and not divided they create additional bookkeeping liabilities under the head of "profit and loss," "undivided profits," "surplus account," or the like. None of these, however, gives to the stockholders as a body, much less to any one of them, either a claim against the going concern for any particular sum of money, or a right to any particular portion of the assets or any share in them unless or until the directors conclude that dividends shall be made and a part of the company's assets segregated from the common fund for the purpose. The dividend normally is payable in money, under exceptional circumstances in some other divisible property; and when so paid, then only (excluding, of course, a possible advantageous sale of his stock or winding-up of the company) does the stockholder realize a profit or gain which becomes his separate property, and thus derive income from the capital that he or his predecessor has invested.
In the present case, the corporation had surplus and undivided profits invested in plant, property, and business, and required for the purposes of the corporation, amounting to about $45,000,000, in addition to outstanding capital stock of $50,000,000. In this the case is not extraordinary. The profits of a corporation, as they appear upon the balance sheet at the end of the year, need not be in the form of money on hand in excess of what is required to meet current liabilities and finance current operations of the company. Often, especially in a growing business, only a part, sometimes a small part, of the year's profits is in property capable of division; the remainder having been absorbed in the acquisition of increased plant, *210 equipment, stock in trade, or accounts receivable, or in decrease of outstanding liabilities. When only a part is available for dividends, the balance of the year's profits is carried to the credit of undivided profits, or surplus, or some other account having like significance. If thereafter the company finds itself in funds beyond current needs it may declare dividends out of such surplus or undivided profits; otherwise it may go on for years conducting a successful business, but requiring more and more working capital because of the extension of its operations, and therefore unable to declare dividends approximating the amount of its profits. Thus the surplus may increase until it equals or even exceeds the par value of the outstanding capital stock. This may be adjusted upon the books in the mode adopted in the case at bar  by declaring a "stock dividend." This, however, is no more than a book adjustment, in essence not a dividend but rather the opposite; no part of the assets of the company is separated from the common fund, nothing distributed except paper certificates that evidence an antecedent increase in the value of the stockholder's capital interest resulting from an accumulation of profits by the company, but profits so far absorbed in the business as to render it impracticable to separate them for withdrawal and distribution. In order to make the adjustment, a charge is made against surplus account with corresponding credit to capital stock account, equal to the proposed "dividend"; the new stock is issued against this and the certificates delivered to the existing stockholders in proportion to their previous holdings. This, however, is merely bookkeeping that does not affect the aggregate assets of the corporation or its outstanding liabilities; it affects only the form, not the essence, of the "liability" acknowledged by the corporation to its own shareholders, and this through a readjustment of accounts on one side of the balance sheet only, increasing "capital stock" at the expense of *211 "surplus"; it does not alter the preexisting proportionate interest of any stockholder or increase the intrinsic value of his holding or of the aggregate holdings of the other stockholders as they stood before. The new certificates simply increase the number of the shares, with consequent dilution of the value of each share.
A "stock dividend" shows that the company's accumulated profits have been capitalized, instead of distributed to the stockholders or retained as surplus available for distribution in money or in kind should opportunity offer. Far from being a realization of profits of the stockholder, it tends rather to postpone such realization, in that the fund represented by the new stock has been transferred from surplus to capital, and no longer is available for actual distribution.
The essential and controlling fact is that the stockholder has received nothing out of the company's assets for his separate use and benefit; on the contrary, every dollar of his original investment, together with whatever accretions and accumulations have resulted from employment of his money and that of the other stockholders in the business of the company, still remains the property of the company, and subject to business risks which may result in wiping out the entire investment. Having regard to the very truth of the matter, to substance and not to form, he has received nothing that answers the definition of income within the meaning of the Sixteenth Amendment.
Being concerned only with the true character and effect of such a dividend when lawfully made, we lay aside the question whether in a particular case a stock dividend may be authorized by the local law governing the corporation, or whether the capitalization of profits may be the result of correct judgment and proper business policy on the part of its management, and a due regard for the interests of the stockholders. And we are considering the taxability of bona fide stock dividends only.
*212 We are clear that not only does a stock dividend really take nothing from the property of the corporation and add nothing to that of the shareholder, but that the antecedent accumulation of profits evidenced thereby, while indicating that the shareholder is the richer because of an increase of his capital, at the same time shows he has not realized or received any income in the transaction.
It is said that a stockholder may sell the new shares acquired in the stock dividend; and so he may, if he can find a buyer. It is equally true that if he does sell, and in doing so realizes a profit, such profit, like any other, is income, and so far as it may have arisen since the Sixteenth Amendment is taxable by Congress without apportionment. The same would be true were he to sell some of his original shares at a profit. But if a shareholder sells dividend stock he necessarily disposes of a part of his capital interest, just as if he should sell a part of his old stock, either before or after the dividend. What he retains no longer entitles him to the same proportion of future dividends as before the sale. His part in the control of the company likewise is diminished. Thus, if one holding $60,000 out of a total $100,000 of the capital stock of a corporation should receive in common with other stockholders a 50 per cent. stock dividend, and should sell his part, he thereby would be reduced from a majority to a minority stockholder, having six-fifteenths instead of six-tenths of the total stock outstanding. A corresponding and proportionate decrease in capital interest and in voting power would befall a minority holder should he sell dividend stock; it being in the nature of things impossible for one to dispose of any part of such an issue without a proportionate disturbance of the distribution of the entire capital stock, and a like diminution of the seller's comparative voting power  that "right preservative of rights" in the control of a corporation. *213 Yet, without selling, the shareholder, unless possessed of other resources, has not the wherewithal to pay an income tax upon the dividend stock. Nothing could more clearly show that to tax a stock dividend is to tax a capital increase, and not income, than this demonstration that in the nature of things it requires conversion of capital in order to pay the tax.
Throughout the argument of the Government, in a variety of forms, runs the fundamental error already mentioned  a failure to appraise correctly the force of the term "income" as used in the Sixteenth Amendment, or at least to give practical effect to it. Thus, the Government contends that the tax "is levied on income derived from corporate earnings," when in truth the stockholder has "derived" nothing except paper certificates which, so far as they have any effect, deny him present participation in such earnings. It contends that the tax may be laid when earnings "are received by the stockholder," whereas he has received none; that the profits are "distributed by means of a stock dividend," although a stock dividend distributes no profits; that under the Act of 1916 "the tax is on the stockholder's share in corporate earnings," when in truth a stockholder has no such share, and receives none in a stock dividend; that "the profits are segregated from his former capital, and he has a separate certificate representing his invested profits or gains," whereas there has been no segregation of profits, nor has he any separate certificate representing a personal gain, since the certificates, new and old, are alike in what they represent  a capital interest in the entire concerns of the corporation.
We have no doubt of the power or duty of a court to look through the form of the corporation and determine the question of the stockholder's right, in order to ascertain whether he has received income taxable by Congress without apportionment. But, looking through the form, *214 we cannot disregard the essential truth disclosed; ignore the substantial difference between corporation and stockholder; treat the entire organization as unreal; look upon stockholders as partners, when they are not such; treat them as having in equity a right to a partition of the corporate assets, when they have none; and indulge the fiction that they have received and realized a share of the profits of the company which in truth they have neither received nor realized. We must treat the corporation as a substantial entity separate from the stockholder, not only because such is the practical fact but because it is only by recognizing such separateness that any dividend  even one paid in money or property  can be regarded as income of the stockholder. Did we regard corporation and stockholders as altogether identical, there would be no income except as the corporation acquired it; and while this would be taxable against the corporation as income under appropriate provisions of law, the individual stockholders could not be separately and additionally taxed with respect to their several shares even when divided, since if there were entire identity between them and the company they could not be regarded as receiving anything from it, any more than if one's money were to be removed from one pocket to another.
Conceding that the mere issue of a stock dividend makes the recipient no richer than before, the Government nevertheless contends that the new certificates measure the extent to which the gains accumulated by the corporation have made him the richer. There are two insuperable difficulties with this: In the first place, it would depend upon how long he had held the stock whether the stock dividend indicated the extent to which he had been enriched by the operations of the company; unless he had held it throughout such operations the measure would not hold true. Secondly, and more important for present purposes, enrichment through increase in value *215 of capital investment is not income in any proper meaning of the term.
The complaint contains averments respecting the market prices of stock such as plaintiff held, based upon sales before and after the stock dividend, tending to show that the receipt of the additional shares did not substantially change the market value of her entire holdings. This tends to show that in this instance market quotations reflected intrinsic values  a thing they do not always do. But we regard the market prices of the securities as an unsafe criterion in an inquiry such as the present, when the question must be, not what will the thing sell for, but what is it in truth and in essence.
It is said there is no difference in principle between a simple stock dividend and a case where stockholders use money received as cash dividends to purchase additional stock contemporaneously issued by the corporation. But an actual cash dividend, with a real option to the stockholder either to keep the money for his own or to reinvest it in new shares, would be as far removed as possible from a true stock dividend, such as the one we have under consideration, where nothing of value is taken from the company's assets and transferred to the individual ownership of the several stockholders and thereby subjected to their disposal.
The Government's reliance upon the supposed analogy between a dividend of the corporation's own shares and one made by distributing shares owned by it in the stock of another company, calls for no comment beyond the statement that the latter distributes assets of the company among the shareholders while the former does not; and for no citation of authority except Peabody v. Eisner, 247 U.S. 347, 349-350.
Two recent decisions, proceeding from courts of high jurisdiction, are cited in support of the position of the Government.
*216 Swan Brewery Co., Ltd., v. Rex, [1914] A.C. 231, arose under the Dividend Duties Act of Western Australia, which provided that "dividend" should include "every dividend, profit, advantage, or gain intended to be paid or credited to or distributed among any members or directors of any company," except, etc. There was a stock dividend, the new shares being allotted among the shareholders pro rata; and the question was whether this was a distribution of a dividend within the meaning of the act. The Judicial Committee of the Privy Council sustained the dividend duty upon the ground that, although "in ordinary language the new shares would not be called a dividend, nor would the allotment of them be a distribution of a dividend," yet, within the meaning of the act, such new shares were an "advantage" to the recipients. There being no constitutional restriction upon the action of the lawmaking body, the case presented merely a question of statutory construction, and manifestly the decision is not a precedent for the guidance of this court when acting under a duty to test an act of Congress by the limitations of a written Constitution having superior force.
In Tax Commissioner v. Putnam (1917), 227 Massachusetts, 522, it was held that the 44th Amendment to the constitution of Massachusetts, which conferred upon the legislature full power to tax incomes, "must be interpreted as including every item which by any reasonable understanding can fairly be regarded as income" (pp. 526, 531); and that under it a stock dividend was taxable as income, the court saying (p. 535): "In essence the thing which has been done is to distribute a symbol representing an accumulation of profits, which instead of being paid out in cash is invested in the business, thus augmenting its durable assets. In this aspect of the case the substance of the transaction is no different from what it would be if a cash dividend had been declared with the privilege of subscription to an equivalent amount of new shares." *217 We cannot accept this reasoning. Evidently, in order to give a sufficiently broad sweep to the new taxing provision, it was deemed necessary to take the symbol for the substance, accumulation for distribution, capital accretion for its opposite; while a case where money is paid into the hand of the stockholder with an option to buy new shares with it, followed by acceptance of the option, was regarded as identical in substance with a case where the stockholder receives no money and has no option. The Massachusetts court was not under an obligation, like the one which binds us, of applying a constitutional amendment in the light of other constitutional provisions that stand in the way of extending it by construction.
Upon the second argument, the Government, recognizing the force of the decision in Towne v. Eisner, supra, and virtually abandoning the contention that a stock dividend increases the interest of the stockholder or otherwise enriches him, insisted as an alternative that by the true construction of the Act of 1916 the tax is imposed not upon the stock dividend but rather upon the stockholder's share of the undivided profits previously accumulated by the corporation; the tax being levied as a matter of convenience at the time such profits become manifest through the stock dividend. If so construed, would the act be constitutional?
That Congress has power to tax shareholders upon their property interests in the stock of corporations is beyond question; and that such interests might be valued in view of the condition of the company, including its accumulated and undivided profits, is equally clear. But that this would be taxation of property because of ownership, and hence would require apportionment under the provisions of the Constitution, is settled beyond peradventure by previous decisions of this court.
The Government relies upon Collector v. Hubbard (1870), *218 12 Wall. 1, 17, which arose under § 117 of the Act of June 30, 1864, c. 173, 13 Stat. 223, 282, providing that "the gains and profits of all companies, whether incorporated or partnership, other than the companies specified in this section, shall be included in estimating the annual gains, profits, or income of any person entitled to the same, whether divided or otherwise." The court held an individual taxable upon his proportion of the earnings of a corporation although not declared as dividends and although invested in assets not in their nature divisible. Conceding that the stockholder for certain purposes had no title prior to dividend declared, the court nevertheless said (p. 18): "Grant all that, still it is true that the owner of a share of stock in a corporation holds the share with all its incidents, and that among those incidents is the right to receive all future dividends, that is, his proportional share of all profits not then divided. Profits are incident to the share to which the owner at once becomes entitled provided he remains a member of the corporation until a dividend is made. Regarded as an incident to the shares, undivided profits are property of the shareholder, and as such are the proper subject of sale, gift, or devise. Undivided profits invested in real estate, machinery, or raw material for the purpose of being manufactured are investments in which the stockholders are interested, and when such profits are actually appropriated to the payment of the debts of the corporation they serve to increase the market value of the shares, whether held by the original subscribers or by assignees." In so far as this seems to uphold the right of Congress to tax without apportionment a stockholder's interest in accumulated earnings prior to dividend declared, it must be regarded as overruled by Pollock v. Farmers' Loan & Trust Co., 158 U.S. 601, 627, 628, 637. Conceding Collector v. Hubbard was inconsistent with the doctrine of that case, because it sustained a direct tax upon property not apportioned *219 among the States, the Government nevertheless insists that the Sixteenth Amendment removed this obstacle, so that now the Hubbard Case is authority for the power of Congress to levy a tax on the stockholder's share in the accumulated profits of the corporation even before division by the declaration of a dividend of any kind. Manifestly this argument must be rejected, since the Amendment applies to income only, and what is called the stockholder's share in the accumulated profits of the company is capital, not income. As we have pointed out, a stockholder has no individual share in accumulated profits, nor in any particular part of the assets of the corporation, prior to dividend declared.
Thus, from every point of view, we are brought irresistibly to the conclusion that neither under the Sixteenth Amendment nor otherwise has Congress power to tax without apportionment a true stock dividend made lawfully and in good faith, or the accumulated profits behind it, as income of the stockholder. The Revenue Act of 1916, in so far as it imposes a tax upon the stockholder because of such dividend, contravenes the provisions of Article I, § 2, cl. 3, and Article I, § 9, cl. 4, of the Constitution, and to this extent is invalid notwithstanding the Sixteenth Amendment.
Judgment affirmed.
MR. JUSTICE HOLMES, dissenting.
I think that Towne v. Eisner, 245 U.S. 418, was right in its reasoning and result and that on sound principles the stock dividend was not income. But it was clearly intimated in that case that the construction of the statute then before the Court might be different from that of the Constitution. 245 U.S. 425. I think that the word "incomes" in the Sixteenth Amendment should be read in *220 "a sense most obvious to the common understanding at the time of its adoption." Bishop v. State, 149 Indiana, 223, 230; State v. Butler, 70 Florida, 102, 133. For it was for public adoption that it was proposed. McCulloch v. Maryland, 4 Wheat. 316, 407. The known purpose of this Amendment was to get rid of nice questions as to what might be direct taxes, and I cannot doubt that most people not lawyers would suppose when they voted for it that they put a question like the present to rest. I am of opinion that the Amendment justifies the tax. See Tax Commissioner v. Putnam, 227 Massachusetts, 522, 532, 533.
MR. JUSTICE DAY concurs in this opinion.
MR. JUSTICE BRANDEIS, dissenting, delivered the following opinion, in which MR. JUSTICE CLARKE concurred.
Financiers, with the aid of lawyers, devised long ago two different methods by which a corporation can, without increasing its indebtedness, keep for corporate purposes accumulated profits, and yet, in effect, distribute these profits among its stockholders. One method is a simple one. The capital stock is increased; the new stock is paid up with the accumulated profits; and the new shares of paid-up stock are then distributed among the stockholders pro rata as a dividend. If the stockholder prefers ready money to increasing his holding of the stock in the company, he sells the new stock received as a dividend. The other method is slightly more complicated. Arrangements are made for an increase of stock to be offered to stockholders pro rata at par and, at the same time, for the payment of a cash dividend equal to the amount which the stockholder will be required to pay to *221 the company, if he avails himself of the right to subscribe for his pro rata of the new stock. If the stockholder takes the new stock, as is expected, he may endorse the dividend check received to the corporation and thus pay for the new stock. In order to ensure that all the new stock so offered will be taken, the price at which it is offered is fixed far below what it is believed will be its market value. If the stockholder prefers ready money to an increase of his holdings of stock, he may sell his right to take new stock pro rata, which is evidenced by an assignable instrument. In that event the purchaser of the rights repays to the corporation, as the subscription price of the new stock, an amount equal to that which it had paid as a cash dividend to the stockholder.
Both of these methods of retaining accumulated profits while in effect distributing them as a dividend had been in common use in the United States for many years prior to the adoption of the Sixteenth Amendment. They were recognized equivalents. Whether a particular corporation employed one or the other method was determined sometimes by requirements of the law under which the corporation was organized; sometimes it was determined by preferences of the individual officials of the corporation; and sometimes by stock market conditions. Whichever method was employed the resultant distribution of the new stock was commonly referred to as a stock dividend. How these two methods have been employed may be illustrated by the action in this respect (as reported in Moodys Manual, 1918 Industrial, and the Commercial and Financial Chronicle), of some of the Standard Oil companies, since the disintegration pursuant to the decision of this court in 1911. Standard Oil Co. v. United States, 221 U.S. 1.
(a) Standard Oil Co. (of Indiana), an Indiana corporation. It had on December 31, 1911, $1,000,000 capital stock (all common), and a large surplus. On May 15, *222 1912, it increased its capital stock to $30,000,000, and paid a simple stock dividend of 2900 per cent. in stock.[1]
(b) Standard Oil Co. (of Nebraska), a Nebraska corporation. If had on December 31, 1911, $600,000 capital stock (all common), and a substantial surplus. On April 15, 1912, it paid a simple stock dividend of 33 1/3 per cent., increasing the outstanding capital to $800,000. During the calendar year 1912 it paid cash dividends aggregating 20 per cent.; but it earned considerably more, and had at the close of the year again a substantial surplus. On June 20, 1913, it declared a further stock dividend of 25 per cent., thus increasing the capital to $1,000,000.[2]
(c) The Standard Oil Co. (of Kentucky), a Kentucky corporation. It had on December 31, 1913, $1,000,000 capital stock (all common), and $3,701,710 surplus. Of this surplus $902,457 had been earned during the calendar year 1913, the net profits of that year having been $1,002,457 and the dividends paid only $100,000 (10 per cent.). On December 22, 1913, a cash dividend of $200 per share was declared payable on February 14, 1914, to stockholders of record January 31, 1914; and these stockholders were offered the right to subscribe for an equal amount of new stock at par and to apply the cash dividend in payment therefor. The outstanding stock was thus increased to $3,000,000. During the calendar years 1914, 1915 and 1916, quarterly dividends were paid on this stock at an annual rate of between 15 per cent. and 20 per cent., but the company's surplus increased by $2,347,614, so that on December 31, 1916, it had a large surplus over its $3,000,000 capital stock. On December 15, 1916, the company issued a circular to the stockholders, saying:
"The company's business for this year has shown a *223 very good increase in volume and a proportionate increase in profits, and it is estimated that by Jan. 1, 1917, the company will have a surplus of over $4,000,000. The board feels justified in stating that if the proposition to increase the capital stock is acted on favorably, it will be proper in the near future to declare a cash dividend of 100%; and to allow the stockholders the privilege pro rata according to their holdings, to purchase the new stock at par, the plan being to allow the stockholders, if they desire, to use their cash dividend to pay for the new stock."
The increase of stock was voted. The company then paid a cash dividend of 100 per cent., payable May 1, 1917, again offering to such stockholders the right to subscribe for an equal amount of new stock at par and to apply the cash dividend in payment therefor.
Moodys Manual, describing the transaction with exactness, says first that the stock was increased from $3,000,000 to $6,000,000, "a cash dividend of 100%, payable May 1, 1917, being exchanged for one share of new stock, the equivalent of a 100% stock dividend." But later in the report giving, as customary in the Manual, the dividend record of the company, the Manual says: "A stock dividend of 200% was paid Feb. 14, 1914, and one of 100% on May 1, 1917." And in reporting specifically the income account of the company for a series of years ending December 31, covering net profits, dividends paid and surplus for the year, it gives, as the aggregate of dividends for the year 1917, $660,000; (which was the aggregate paid on the quarterly cash dividend  5 per cent. January and April; 6 per cent. July and October); and adds in a note: "In addition a stock dividend of 100% was paid during the year."[1a] The Wall Street Journal of *224 May 2, 1917, p. 2, quotes the 1917 "High" price for Standard Oil of Kentucky as "375 Ex. Stock Dividend."
It thus appears that among financiers and investors the distribution of the stock by whichever method effected is called a stock dividend; that the two methods by which accumulated profits are legally retained for corporate purposes and at the same time distributed as dividends are recognized by them to be equivalents; and that the financial results to the corporation and to the stockholders of the two methods are substantially the same  unless a difference results from the application of the federal income tax law.
Mrs. Macomber, a citizen and resident of New York, was, in the year 1916, a stockholder in the Standard Oil Company (of California), a corporation organized under the laws of California and having its principal place of business in that State. During that year she received from the company a stock dividend representing profits earned since March 1, 1913. The dividend was paid by direct issue of the stock to her according to the simple method described above, pursued also by the Indiana and Nebraska companies. In 1917 she was taxed under the federal law on the stock dividend so received at its par value of $100 a share, as income received during the year 1916. Such a stock dividend is income as distinguished from capital both under the law of New York and under the law of California; because in both States every dividend representing profits is deemed to be income whether paid in cash or in stock. It had been so held in New York, where the question arose as between life-tenant and remainderman, Lowry v. Farmers' Loan & Trust Co., 172 N.Y. 137; Matter of Osborne, 209 N.Y. 450; and also, where the question arose in matters of taxation. People v. Glynn, *225 130 App. Div. 332; 198 N.Y. 605. It has been so held in California, where the question appears to have arisen only in controversies between life-tenant and remainderman. Estate of Duffill, 58 Cal. Dec. 97; 180 California, 748.
It is conceded that if the stock dividend paid to Mrs. Macomber had been made by the more complicated method pursued by the Standard Oil Company of Kentucky, that is, issuing rights to take new stock pro rata and paying to each stockholder simultaneously a dividend in cash sufficient in amount to enable him to pay for this pro rata of new stock to be purchased  the dividend so paid to him would have been taxable as income, whether he retained the cash or whether he returned it to the corporation in payment for his pro rata of new stock. But it is contended that, because the simple method was adopted of having the new stock issued direct to the stockholders as paid-up stock, the new stock is not to be deemed income; whether she retained it or converted it into cash by sale. If such a different result can flow merely from the difference in the method pursued, it must be because Congress is without power to tax as income of the stockholder either the stock received under the latter method or the proceeds of its sale; for Congress has, by the provisions in the Revenue Act of 1916, expressly declared its purpose to make stock dividends, by whichever method paid, taxable as income.
The Sixteenth Amendment proclaimed February 25, 1913, declares:
"The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."
The Revenue Act of September 8, 1916, c. 463, 39 Stat. 756, 757, provided:
"That the term `dividends' as used in this title shall *226 be held to mean any distribution made or ordered to be made by a corporation, . . . out of its earnings or profits accrued since March first, nineteen hundred and thirteen, and payable to its shareholders, whether in cash or in stock of the corporation . .. which stock dividend shall be considered income, to the amount of its cash value."
Hitherto powers conferred upon Congress by the Constitution have been liberally construed, and have been held to extend to every means appropriate to attain the end sought. In determining the scope of the power the substance of the transaction, not its form has been regarded. Martin v. Hunter, 1 Wheat. 304, 326; McCulloch v. Maryland, 4 Wheat. 316, 407, 415; Brown v. Maryland, 12 Wheat. 419, 446; Craig v. Missouri, 4 Pet. 410, 433; Jarrolt v. Moberly, 103 U.S. 580, 585, 587; Legal Tender Case, 110 U.S. 421, 444; Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58; United States v. Realty Co., 163 U.S. 427, 440, 441, 442; South Carolina v. United States, 199 U.S. 437, 448-9. Is there anything in the phraseology of the Sixteenth Amendment or in the nature of corporate dividends which should lead to a departure from these rules of construction and compel this court to hold, that Congress is powerless to prevent a result so extraordinary as that here contended for by the stockholder?
First: The term "income" when applied to the investment of the stockholder in a corporation, had, before the adoption of the Sixteenth Amendment, been commonly understood to mean the returns from time to time received by the stockholder from gains or earnings of the corporation. A dividend received by a stockholder from a corporation may be either in distribution of capital assets or in distribution of profits. Whether it is the one or the other is in no way affected by the medium in which it is paid, nor by the method or means through which the particular thing distributed as a dividend was procured. If the *227 dividend is declared payable in cash, the money with which to pay it is ordinarily taken from surplus cash in the treasury. But (if there are profits legally available for distribution and the law under which the company was incorporated so permits) the company may raise the money by discounting negotiable paper; or by selling bonds, scrip or stock of another corporation then in the treasury; or by selling its own bonds, scrip or stock then in the treasury; or by selling its own bonds, scrip or stock issued expressly for that purpose. How the money shall be raised is wholly a matter of financial management. The manner in which it is raised in no way affects the question whether the dividend received by the stockholder is income or capital; nor can it conceivably affect the question whether it is taxable as income.
Likewise whether a dividend declared payable from profits shall be paid in cash or in some other medium is also wholly a matter of financial management. If some other medium is decided upon, it is also wholly a question of financial management whether the distribution shall be, for instance, in bonds, scrip or stock of another corporation or in issues of its own. And if the dividend is paid in its own issues, why should there be a difference in result dependent upon whether the distribution was made from such securities then in the treasury or from others to be created and issued by the company expressly for that purpose? So far as the distribution may be made from its own issues of bonds, or preferred stock created expressly for the purpose, it clearly would make no difference in the decision of the question whether the dividend was a distribution of profits, that the securities had to be created expressly for the purpose of distribution. If a dividend paid in securities of that nature represents a distribution of profits Congress may, of course, tax it as income of the stockholder. Is the result different where the security distributed is common stock?
*228 Suppose that a corporation having power to buy and sell its own stock, purchases, in the interval between its regular dividend dates, with monies derived from current profits, some of its own common stock as a temporary investment, intending at the time of purchase to sell it before the next dividend date and to use the proceeds in paying dividends, but later, deeming it inadvisable either to sell this stock or to raise by borrowing the money necessary to pay the regular dividend in cash, declares a dividend payable in this stock:  Can anyone doubt that in such a case the dividend in common stock would be income of the stockholder and constitutionally taxable as such? See Green v. Bissell, 79 Connecticut, 547; Leland v. Hayden, 102 Massachusetts, 542. And would it not likewise be income of the stockholder subject to taxation if the purpose of the company in buying the stock so distributed had been from the beginning to take it off the market and distribute it among the stockholders as a dividend, and the company actually did so? And proceeding a short step further: Suppose that a corporation decided to capitalize some of its accumulated profits by creating additional common stock and selling the same to raise working capital, but after the stock has been issued and certificates therefor are delivered to the bankers for sale, general financial conditions make it undesirable to market the stock and the company concludes that it is wiser to husband, for working capital, the cash which it had intended to use in paying stockholders a dividend, and, instead, to pay the dividend in the common stock which it had planned to sell: Would not the stock so distributed be a distribution of profits  and, hence, when received, be income of the stockholder and taxable as such? If this be conceded, why should it not be equally income of the stockholder, and taxable as such, if the common stock created by capitalizing profits, had been originally created for the express purpose of being distributed *229 as a dividend to the stockholder who afterwards received it?
Second: It has been said that a dividend payable in bonds or preferred stock created for the purpose of distributing profits may be income and taxable as such, but that the case is different where the distribution is in common stock created for that purpose. Various reasons are assigned for making this distinction. One is that the proportion of the stockholder's ownership to the aggregate number of the shares of the company is not changed by the distribution. But that is equally true where the dividend is paid in its bonds or in its preferred stock. Furthermore, neither maintenance nor change in the proportionate ownership of a stockholder in a corporation has any bearing upon the question here involved. Another reason assigned is that the value of the old stock held is reduced approximately by the value of the new stock received, so that the stockholder after receipt of the stock dividend has no more than he had before it was paid. That is equally true whether the dividend be paid in cash or in other property, for instance, bonds, scrip or preferred stock of the company. The payment from profits of a large cash dividend, and even a small one, customarily lowers the then market value of stock because the undivided property represented by each share has been correspondingly reduced. The argument which appears to be most strongly urged for the stockholders is, that when a stock dividend is made, no portion of the assets of the company is thereby segregated for the stockholder. But does the issue of new bonds or of preferred stock created for use as a dividend result in any segregation of assets for the stockholder? In each case he receives a piece of paper which entitles him to certain rights in the undivided property. Clearly segregation of assets in a physical sense is not an essential of income. The year's gains of a partner are taxable as income, although there, likewise, no *230 segregation of his share in the gains from that of his partners is had.
The objection that there has been no segregation is presented also in another form. It is argued that until there is a segregation, the stockholder cannot know whether he has really received gains; since the gains may be invested in plant or merchandise or other property and perhaps be later lost. But is not this equally true of the share of a partner in the year's profits of the firm or, indeed, of the profits of the individual who is engaged in business alone? And is it not true, also, when dividends are paid in cash? The gains of a business, whether conducted by an individual, by a firm or by a corporation, are ordinarily reinvested in large part. Many a cash dividend honestly declared as a distribution of profits, proves later to have been paid out of capital, because errors in forecast prevent correct ascertainment of values. Until a business adventure has been completely liquidated, it can never be determined with certainty whether there have been profits unless the returns have at least exceeded the capital originally invested. Business men, dealing with the problem practically, fix necessarily periods and rules for determining whether there have been net profits  that is income or gains. They protect themselves from being seriously misled by adopting a system of depreciation charges and reserves. Then, they act upon their own determination, whether profits have been made. Congress in legislating has wisely adopted their practices as its own rules of action.
Third: The Government urges that it would have been within the power of Congress to have taxed as income of the stockholder his pro rata share of undistributed profits earned, even if no stock dividend representing it had been paid. Strong reasons may be assigned for such a view. See Collector v. Hubbard, 12 Wall. 1. The undivided share of a partner in the year's undistributed profits of his firm *231 is taxable as income of the partner, although the share in the gain is not evidenced by any action taken by the firm. Why may not the stockholder's interest in the gains of the company? The law finds no difficulty in disregarding the corporate fiction whenever that is deemed necessary to attain a just result. Linn & Lane Timber Co. v. United States, 236 U.S. 574; see Morawetz on Corporations, 2d ed., §§ 227-231; Cook on Corporations, 7th ed., §§ 663, 664. The stockholder's interest in the property of the corporation differs, not fundamentally but in form only, from the interest of a partner in the property of the firm. There is much authority for the proposition that, under our law, a partnership or joint stock company is just as distinct and palpable an entity in the idea of the law, as distinguished from the individuals composing it, as is a corporation.[1b] No reason appears, why Congress, in legislating under a grant of power so comprehensive as that authorizing the levy of an income tax, should be limited by the particular view of the relation of the stockholder to the corporation and its property which may, in the absence of legislation, have been taken by this court. But we have no occasion to decide the question whether Congress might have taxed to the stockholder his undivided share of the corporation's earnings. For Congress has in this act limited the income tax to that share of the stockholder in the earnings which is, in effect, distributed by means of the stock dividend paid. In other words, to render the stockholder taxable there must be both earnings made and a dividend paid. Neither earnings without dividend  nor a dividend without earnings  subjects the *232 stockholder to taxation under the Revenue Act of 1916.
Fourth: The equivalency of all dividends representing profits, whether paid in cash or in stock, is so complete that serious question of the taxability of stock dividends would probably never have been made, if Congress had undertaken to tax only those dividends which represented profits earned during the year in which the dividend was paid or in the year preceding. But this court, construing liberally not only the constitutional grant of power but also the Revenue Act of 1913, held that Congress might tax, and had taxed, to the stockholder dividends received during the year, although earned by the company long before; and even prior to the adoption of the Sixteenth Amendment. Lynch v. Hornby, 247 U.S. 339.[1c] That rule, if indiscriminatingly applied to all stock dividends representing profits earned, might, in view of corporate practice, have worked considerable hardship, and have raised serious questions. Many corporations, without legally capitalizing any part of their profits, had assigned definitely some part or all of the annual balances remaining after paying the usual cash dividends, to the uses to which permanent capital is ordinarily applied. Some of the corporations doing this, transferred such balances on their books to "Surplus" account,  distinguishing between such permanent "Surplus" and the "Undivided Profits" account. Other corporations, without this formality, had assumed that the annual accumulating balances carried as undistributed profits were to be treated as capital permanently invested in the business. And still others, without definite assumption of any kind, had *233 so used undivided profits for capital purposes. To have made the revenue law apply retroactively so as to reach such accumulated profits, if and whenever it should be deemed desirable to capitalize them legally by the issue of additional stock distributed as a dividend to stockholders, would have worked great injustice. Congress endeavored in the Revenue Act of 1916 to guard against any serious hardship which might otherwise have arisen from making taxable stock dividends representing accumulated profits. It did not limit the taxability to stock dividends representing profits earned within the tax year or in the year preceding; but it did limit taxability to such dividends representing profits earned since March 1, 1913. Thereby stockholders were given notice that their share also in undistributed profits accumulating thereafter was at some time to be taxed as income. And Congress sought by § 3 to discourage the postponement of distribution for the illegitimate purpose of evading liability to surtaxes.
Fifth: The decision of this court, that earnings made before the adoption of the Sixteenth Amendment but paid out in cash dividend after its adoption were taxable as income of the stockholder, involved a very liberal construction of the Amendment. To hold now that earnings both made and paid out after the adoption of the Sixteenth Amendment cannot be taxed as income of the stockholder, if paid in the form of a stock dividend, involves an exceeding narrow construction of it. As said by Mr. Chief Justice Marshall in Brown v. Maryland, 12 Wheat. 419, 446: "To construe the power so as to impair its efficacy, would tend to defeat an object, in the attainment of which the American public took, and justly took, that strong interest which arose from a full conviction of its necessity."
No decision heretofore rendered by this court requires us to hold that Congress, in providing for the taxation of *234 stock dividends, exceeded the power conferred upon it by the Sixteenth Amendment. The two cases mainly relied upon to show that this was beyond the power of Congress are Towne v. Eisner, 245 U.S. 418, which involved a question not of constitutional power but of statutory construction, and Gibbons v. Mahon, 136 U.S. 549, which involved a question arising between life-tenant and remainderman. So far as concerns Towne v. Eisner, we have only to bear in mind what was there said (p. 425): "But it is not necessarily true that income means the same thing in the Constitution and the [an] act."[1d]Gibbons v. Mahon is even less an authority for a narrow construction of the power to tax incomes conferred by the Sixteenth Amendment. In that case the court was required to determine how, in the administration of an estate in the District of Columbia, a stock dividend, representing profits, received after the decedent's death, should be disposed of as between life-tenant and remainderman. The question was in essence: What shall the intention of the testator be presumed to have been? On this question there was great diversity of opinion and practice in the courts of English-speaking countries. Three well-defined rules were then competing for acceptance; two of these involve an arbitrary rule of distribution, the third equitable apportionment. See Cook on Corporations, 7th ed., §§ 552-558.
1. The so-called English rule, declared in 1799, by Brander v. Brander, 4 Ves. Jr. 800, that a dividend representing *235 profits, whether in cash, stock or other property, belongs to the life-tenant if it was a regular or ordinary dividend, and belongs to the remainderman if it was an extraordinary dividend.
2. The so-called Massachusetts rule, declared in 1868 by Minot v. Paine, 99 Massachusetts, 101, that a dividend representing profits, whether regular, ordinary or extraordinary, if in cash belongs to the life-tenant, and if in stock belongs to the remainderman.
3. The so-called Pennsylvania rule declared in 1857 by Earp's Appeal, 28 Pa. St. 368, that where a stock dividend is paid, the court shall inquire into the circumstances under which the fund had been earned and accumulated out of which the dividend, whether a regular, an ordinary or an extraordinary one, was paid. If it finds that the stock dividend was paid out of profits earned since the decedent's death, the stock dividend belongs to the life-tenant; if the court finds that the stock dividend was paid from capital or from profits earned before the decedent's death, the stock dividend belongs to the remainderman.
This court adopted in Gibbons v. Mahon as the rule of administration for the District of Columbia the so-called Massachusetts rule, the opinion being delivered in 1890 by Mr. Justice Gray. Since then the same question has come up for decision in many of the States. The so-called Massachusetts rule, although approved by this court, has found favor in only a few States. The so-called Pennsylvania rule, on the other hand, has been adopted since by so many of the States (including New York and California), that it has come to be known as the "American Rule." Whether, in view of these facts and the practical results of the operation of the two rules as shown by the experience of the thirty years which have elapsed since the decision in Gibbons v. Mahon, it might be desirable for this court to reconsider the question there decided, as *236 some other courts have done (see 29 Harvard Law Review, 551), we have no occasion to consider in this case. For, as this court there pointed out (p. 560), the question involved was one "between the owners of successive interests in particular shares," and not, as in Bailey v. Railroad Co., 22 Wall. 604, a question "between the corporation and the government, and [which] depended upon the terms of a statute carefully framed to prevent corporations from evading payment of the tax upon their earnings."
We have, however, not merely argument, we have examples which should convince us that "there is no inherent, necessary and immutable reason why stock dividends should always be treated as capital." Tax Commissioner v. Putnam, 227 Massachusetts, 522, 533. The Supreme Judicial Court of Massachusetts has steadfastly adhered, despite ever-renewed protest, to the rule that every stock dividend is, as between life-tenant and remainderman, capital and not income. But in construing the Massachusetts Income Tax Amendment, which is substantially identical with the Federal Amendment, that court held that the legislature was thereby empowered to levy an income tax upon stock dividends representing profits. The courts of England have, with some relaxation, adhered to their rule that every extraordinary dividend is, as between life-tenant and remainderman, to be deemed capital. But in 1913 the Judicial Committee of the Privy Council held that a stock dividend representing accumulated profits was taxable like an ordinary cash dividend, Swan Brewery Co., Ltd., v. Rex, [1914] A.C. 231. In dismissing the appeal these words of the Chief Justice of the Supreme Court of Western Australia were quoted (p. 236), which show that the facts involved were identical with those in the case at bar: "Had the company distributed the 101,450 £ among the shareholders and had the shareholders repaid such sums to the company as the price of the 81,160 new shares, the duty on the 101,450 £ *237 would clearly have been payable. Is not this virtually the effect of what was actually done? I think it is."
Sixth: If stock dividends representing profits are held exempt from taxation under the Sixteenth Amendment, the owners of the most successful businesses in America will, as the facts in this case illustrate, be able to escape taxation on a large part of what is actually their income. So far as their profits are represented by stock received as dividends they will pay these taxes not upon their income but only upon the income of their income. That such a result was intended by the people of the United States when adopting the Sixteenth Amendment is inconceivable. Our sole duty is to ascertain their intent as therein expressed.[1e] In terse, comprehensive language befitting the Constitution, they empowered Congress "to lay and collect taxes on incomes, from whatever source derived." They intended to include thereby everything which by reasonable understanding can fairly be regarded as income. That stock dividends representing profits are so regarded, not only by the plain people but by investors and financiers, and by most of the courts of the country, is shown, beyond peradventure, by their acts and by their utterances. It seems to me clear, therefore, that Congress possesses the power which it exercised to make dividends representing profits, taxable as income, whether the medium in which the dividend is paid be cash or stock, and that it may define, as it has done, what dividends representing *238 profits shall be deemed income. It surely is not clear that the enactment exceeds the power granted by the Sixteenth Amendment. And, as this court has so often said, the high prerogative of declaring an act of Congress invalid, should never be exercised except in a clear case.[1f] "It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body, by which any law is passed, to presume in favor of its validity, until its violation of the Constitution is proved beyond all reasonable doubt." Ogden v. Saunders, 12 Wheat. 213, 270.
MR. JUSTICE CLARKE concurs in this opinion.
NOTES
[1] I  INCOME TAX.
PART I.  ON INDIVIDUALS.
Sec. 2 (a) That, subject only to such exemptions and deductions as are hereinafter allowed, the net income of a taxable person shall include gains, profits, and income derived .. ., also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever: Provided, That the term "dividends" as used in this title shall be held to mean any distribution made or ordered to be made by a corporation, . . . out of its earnings or profits accrued since March first, nineteen hundred and thirteen, and payable to its shareholders, whether in cash or in stock of the corporation, . .. which stock dividend shall be considered income, to the amount of its cash value.
[1] Moodys, p. 1544; Commercial and Financial Chronicle, Vol. 94, p. 831; Vol. 98, pp. 1005, 1076.
[2] Moodys, p. 1548; Commercial and Financial Chronicle, Vol. 94, p. 771; Vol. 96, p. 1428; Vol. 97, p. 1434; Vol. 98, p. 1541.
[1a] Moodys, p. 1547; Commercial and Financial Chronicle, Vol. 97, pp. 1589, 1827, 1903; Vol. 98, pp. 76, 457; Vol. 103, p. 2348. Poor's Manual of Industrials (1918), p. 2240, in giving the "Comparative Income Account" of the company describes the 1914 dividend as "Stock Dividend paid (200%)  $2,000,000"; and describes the 1917 dividend as "$3,000,000 special cash dividend."
[1b] See "Some Judicial Myths," by Francis M. Burdick, 22 Harvard Law Review, 393, 394-396; The Firm as a Legal Person, by William Hamilton Cowles, 57 Cent. L.J., 343, 348; The Separate Estates of Non-Bankrupt Partners, by J.D. Brannan, 20 Harvard Law Review, 589-592; compare Harvard Law Review, Vol. 7, p. 426; Vol. 14, p. 222; Vol. 17, p. 194.
[1c] The hardship supposed to have resulted from such a decision has been removed in the Revenue Act of 1916, as amended, by providing in § 31 (b) that such cash dividends shall thereafter be exempt from taxation, if before they are made, all earnings made since February 28, 1913, shall have been distributed. Act of October 3, 1917, c. 63, § 1211, 40 Stat. 338; Act of February 24, 1919, c. 18, § 201 (b), 40 Stat. 1059.
[1d] Compare Rugg, C.J., in Tax Commissioner v. Putnam, 227 Massachusetts, 522, 533: "However strong such an argument might be when urged as to the interpretation of a statute, it is not of prevailing force as to the broad considerations involved in the interpretation of an amendment to the Constitution adopted under the conditions preceding and attendant upon the ratification of the Forty-fourth Amendment."
[1e] Compare Rugg, C.J., Tax Commissioner v. Putnam, 227 Massachusetts, 522, 524: "It is a grant from the sovereign people and not the exercise of a delegated power. It is a statement of general principles and not a specification of details. Amendments to such a charter of government ought to be construed in the same spirit and according to the same rules as the original. It is to be interpreted as the Constitution of a State and not as a statute or an ordinary piece of legislation. Its words must be given a construction adapted to carry into effect its purpose."
[1f] "It is our duty, when required in the regular course of judicial proceedings, to declare an act of Congress void if not within the legislative power of the United States; but this declaration should never be made except in a clear case. Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule." Sinking-Fund Cases, 99 U.S. 700, 718 (1878). See also Legal Tender Cases, 12 Wall. 457, 531 (1870); Trade-Mark Cases, 100 U.S. 82, 96 (1879). See American Doctrine of Constitutional Law, by James B. Thayer, 7 Harvard Law Review, 129, 142.

"With the exception of the extraordinary decree rendered in the Dred Scott Case, . . . all of the acts or the portions of the acts of Congress invalidated by the courts before 1868 related to the organization of courts. Denying the power of Congress to make notes legal tender seems to be the first departure from this rule." Haines, American Doctrine of Judicial Supremacy, p. 288. The first legal tender decision was overruled in part two years later (1870), Legal Tender Cases, 12 Wall. 457; and again in 1883, Legal Tender Case, 110 U.S. 421.