## MAHONING COAL R. CO. et al. v. UNITED STATES, and three other cases.

### Nos. 14311, 15408, 15409, 15256.

District Court, N. D. Ohio, E. D.

April 12, 1930.

See also 28 F.(2d) 917.

C. C. Handy, of Cleveland, Ohio, for plaintiffs.

The United States District Attorney, for the United States.

JONES, District Judge.

These four cases were consolidated for the purpose of trial and were submitted upon written stipulations of fact and some additional oral testimony. No. 14311 is for the recovery of alleged overpayment of taxes for the years 1917 and 1918. No. 15256 is for the recovery of additional taxes claimed to be due for the years 1919 and 1920. No. 15408 is for the recovery of amounts assessed as additional taxes due for the years 1917 and 1918 and paid under protest. No. 15409 is for the recovery of taxes assessed and paid as additional taxes for 1919 and 1920, and which were held to have been overpaid by decision of the Board of Tax Appeals, in which the Commissioner did not acquiesce.

It is unnecessary to recount all of the issues involved in each of these four cases, since they may be disposed of by the consideration of two main questions involved:

First. Were the New York Central Company and Mahoning Coal Railroad Company affiliated corporations during the years involved, within the meaning of the applicable sections of the Revenue Acts of 1918 and 1921?

Second. Did certain payments of income taxes on behalf of the Mahoning Coal Railroad by the New York Central Railroad, for the years in question, constitute additional income to the Mahoning Coal Railroad Company and thus subject to the additional taxes assessed and sued for?

The first question depends upon whether the facts meet the test required by section 240(b) of the Revenue Act of 1918 (40 Stat. 1057) and subdivisions (c) and (e) of the

Revenue Act of 1921 (42 Stat. 227); these sections having identical phrasing as to affiliation.

Section 240(b) of the Revenue Act of 1918:

"For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests."

Section 240(c) and (e) of the Revenue Act of 1921:

"(c) For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests. * * *

"(e) Corporations which are affiliated within the meaning of this section shall make consolidated returns for any taxable year beginning prior to January 1, 1922, in the same manner and subject to the same conditions as provided by the Revenue Act of 1918."

In 1884 the Mahoning Coal Railroad Company (hereinafter referred to as Mahoning Company) leased its railroad running from Youngstown, Ohio, to Andover and Mann, Ohio, to the Lake Shore & Michigan Southern Railroad Company, reserving as rental under the lease upon full accounting of earnings derived from the operation of the railroad by the lessee, 40 per cent. of the gross earnings, the remaining 60 per cent. to be retained by lessee; accounting to be had on or before the 1st day of January and July of each year.

The Mahoning Company was operated by the Lake Shore until December, 1914, when the latter company was consolidated with the New York Central Railroad (hereinafter referred to as the Central Company), whereby Central Company succeeded to the rights and obligations of the Lake Shore, and has ever since operated the Mahoning Company under the original lease. The Central Company operates the Mahoning Company's railroad as its Franklin Division, but the operation is without respect to the fact that the trains operate over the roads of two independent companies, except as it is necessary to apportion the revenue received from the oper-

ation in connection with the terms of the lease on the basis of mileage and tonnage.

In 1918 there was a supplemental agreement executed whereby the annual compensation to the Mahoning Company during the period of federal control should be $1,309,-845.67; this amount being payable to the Mahoning Company in addition to the liability of Central Company to pay taxes and assessments as provided by the lease. The Mahoning Company at all times since 1884 has preserved its corporate existence and organization, with its president and board of directors, and annual meetings have been held. It has, however, not maintained any operating organization, nor has it in any way operated its properties which are entirely under the control and management of the Central Company. During the years 1916 to 1920, inclusive, there were outstanding 43,227 shares of stock of the Mahoning Company consisting of 30,000 shares of common stock and 13,227 shares of preferred stock; both common and preferred stock possessing voting rights.

The following table discloses the amounts and percentages of stock held by stockholders of the Central Company during those years:

| Held by stockholders of the New York Central. | Held by New York Central and Directors. | Percentage of stock held by New York Central Railroad and its stockholders. |
|---|---|---|
| 1916 | 7358 | 25288 | 73.52% |
| 1917 | 7592 | 25288 | 76.06% |
| 1918 | 7310 | 25288 | 75.41% |
| 1919 | 7096 | 25308 | 74.09% |
| 1920 | 7094 | 25308 | 74.09% |

At all of the stockholders' meetings of the Mahoning Company held during 1917 to 1920, inclusive, 98.7 per cent. of all shares of stock voting was voted by the officers, directors, and officials of the Central Company, personally or pursuant to proxies executed by stockholders of the Mahoning Company. During the years in question the officers and directors of the Central Company were officers and directors of the Mahoning Company, and by reason of the control of the voting stock the Central Company dominated in representation upon the board of directors of the Mahoning Company. The two corporations maintained their distinct entities, and under the lease the Mahoning Company could repossess itself of its railroad upon breach of covenant by the Central Company.

Upon substantially these facts, stated more in detail, the Board of Tax Appeals

concluded that the two companies were affiliated. Appeal of Mahoning Coal Railroad Co., 4 B. T. A. 923. This decision was rendered upon the issues presented here in case No. 15409 involving the overpayment of taxes by the Mahoning Company for the years 1919 and 1920.

The government contends that, conceding complete business control in the Central Company, there was not the stock control contemplated by the statute, relying mainly upon Ice Service Co. v. Commissioner of Internal Revenue (C. C. A.) 30 F.(2d) 230; Commissioner of Internal Revenue v. Adolph Hirsch & Co. (C. C. A.) 30 F.(2d) 645, followed by Alameda Inv. Co. v. McLaughlin (C. C. A.) 33 F.(2d) 120, and later cases; also by subsequent decisions of the Board of Tax Appeals. The failure of Congress in these earlier acts to definitely state the amount of stock necessary to be owned or controlled by one corporation, or by the same interests, has left the question of what is "substantially all the stock" in the field of judicial interpretation, unless it may be said that the Commissioner is at liberty to define the term, which in fact he has done in articles 631 and 633 of Regulation 45, printed in the margin.[1] Although in Great Lakes Hotel

Co. v. Commissioner of Internal Revenue (C. C. A.) 30 F.(2d) 1, it was held that the Commissioner had no power to interpret the law.

■■■ The question of affiliation seems to me to turn mainly on whether the two corporations comprise in reality a single business enterprise dominated by virtue of stock control in one or by the same interests. The object and purpose of the act was to accurately determine the true net income and invested capital of the corporations required and permitted to file consolidated returns; and, further, to prevent tax evasion by requiring the filing of consolidated returns where corporations were affiliated, and to afford a convenient method for taxpayers for escaping unjust burdens, when they are in reality a single enterprise. That those were the objects to be accomplished may be found from the report of the Senate Finance Committee, No. 617, 65th Congress, 3d Session, 1918–19 Senate Reports, vol. 1, Misc. 1, which is as follows:

"Moreover, a law which contains no requirement for consolidation, puts an almost irresistible premium on a segregation or a separate incorporation of activities which

---

[1] "Treasury Department Regulation 45, Article 631 (1918 Ed.)

"The provision of the statute requiring affiliated corporations to file consolidated returns is based upon the principle of levying the tax according to the true net income and invested capital of a single business enterprise, even though the business is operated through more than one corporation. Where one corporation owns the capital stock of another corporation or other corporations, or where the stock of two or more corporations is owned by the same interests, a situation results which is closely analogous to that of a business maintaining one or more branch establishments. In the latter case, because of the direct ownership of the property, the invested capital and net income of the branch form a part of the invested capital and net income of the entire organization. Where such branches or units of a business are owned and controlled through the medium of separate corporations, it is necessary to require a consolidated return in order that the invested capital and net income of the entire group may be accurately determined. Otherwise opportunity would be afforded for the evasion of taxation by the shifting of income through price fixing, charges for services and other means by which income could be arbitrarily assigned to one or another unit of the group. In other cases without a consolidated return excessive taxation might be imposed as a result of purely artificial conditions existing between corporations within a controlled group."

"Treasury Department Regulation 45, Article 633 (1920 Ed.).

"Corporations will be deemed to be affiliated (a) when one domestic corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (b) when substantially all the stock of two or more domestic corporations is owned or controlled by the same interests. The words 'substantially all the stock' cannot be interpreted as meaning any particular percentage, but must be construed according to the facts of the particular case. The owning or controlling of 95 per cent. or more of the outstanding voting capital stock (not including stock in the treasury) at the beginning of and during the taxable year will be deemed to constitute an affiliation within the meaning of the statute. Consolidated returns may, however, be required even though the stock ownership is less than 95 per cent. When the stock ownership or control is less than 95 per cent., but in excess of 50 per cent., a full disclosure of affiliations should be made, showing all pertinent facts, including the stock owned or controlled in each subsidiary or affiliated corporation and the percentage of such stock owned or controlled to the total stock outstanding. Such statement should preferably be made in advance of filing the return, with a request for instructions as to whether a consolidated return should be made. In any event such a statement should be filed as a part of the return. The words 'the same interests' shall be deemed to mean the same individual or partnership or the same individuals or partnerships, but when the stock of two or more corporations is owned or controlled by two or more individuals or by two or more partnerships a consolidated return is not required unless the percentage of stock held by each individual or each partnership is substantially the same in each of the affiliated corporations."

would normally be carried as branches of one concern. Increasing evidence has come to light demonstrating that the possibilities of evading taxation in these and allied ways are becoming familiar to the taxpayers of the country. While the committee is convinced that the consolidated return tends to conserve, not to reduce, the revenue, the committee recommends its adoption not primarily because it operates to prevent evasion of taxes or because of its effect upon the revenue, but because the principle of taxing as a business unit what in reality is a business unit is sound and convenient, both to the taxpayer and to the government."

Have these corporations such a common object and interest as to be, in fact, a business unit, and may their corporate entities be disregarded with no divergent or conflicting interests among their stockholders? This was in reality the test applied in Great Lakes Hotel Co. v. Commissioner of Internal Revenue, supra. This case is different from Commissioner of Internal Revenue v. Shillito Co., 39 F.(2d) 830, lately decided by the Circuit Court of Appeals for the Sixth Circuit, where, in addition to effective stock control being in the store company, the realty company was created and existed only for the purposes of the store company. The Mahoning Company was not a creature of the Central Company, was not a subsidiary, and did not exist merely for the purpose of the Central Company, although a profitable and successful operation of its railroad by the Central Company inured to its benefit under the compensation clause of the lease. To this extent there is substantial identity of interest in the enterprise, and this may be sufficient if the outside owned stock is practically negligible. Ice Service Co. v. Commissioner of Internal Revenue, supra. It is also true that practically the only business of the Mahoning Company during the time in question was to receive its 40 per cent. of the gross earnings from the operation of its railroad and to distribute dividends out of that money to its stockholders. It might, however, repossess its railroad for breach of covenant by the Central Company.

In the years 1919 and 1920, the same 33 persons held 7,094 shares of Mahoning Company stock and 177,367 shares of Central Company stock. One stockholder held 1,200 shares of Mahoning Company stock and 119,300 shares of Central Company stock. The Central Company held 25,308 shares of the Mahoning Company stock. Certainly, as to 32,402 shares held by the Central Company and its stockholders there was a unity of interest. But what is the situation as to the remaining 10,825 shares of the 43,227 shares outstanding? Part of those minority stockholders apparently executed proxies to the officers of the Central Company, since 33,192 and 33,581 shares, respectively, were voted by officers and officials of the Central Company, personally and by proxy, at the annual meetings of 1919 and 1920. Can it be said that these outside minority stockholders holding or owning 10,825 shares would suffer disadvantage and might receive benefits through the operation of the Central Company in which they had no interest or representation? Commissioner of Internal Revenue v. Adolph Hirsch & Co., supra. Can their interests be said to be negligible, or, as the test is applied, does the Central Company or the same interests control or own substantially all the stock despite this amount of outside minority stock?

The profitable operation of the Mahoning Company's railroad was a mutual benefit to these corporations. Each corporation received a fixed percentage of the gross earnings, and thus each had a common interest in the total earnings of the railroad. There could be no evasion of income tax by an apportionment to an affiliated or subsidiary corporation of any part of the earnings or net income. Pelican Ice Co. v. Commissioner of Internal Revenue (C. C. A.) 37 F.(2d) 285, 286. The invested capital could be accurately determined and the tax apportioned on the basis of the net income assignable to each, in the absence of any agreement between the corporations. The income of each corporation was derived from a common source to the extent of their respective interests in the Mahoning Company's railroad. So far as the operation of the railroad was concerned, it was a single enterprise in which the gross earnings were segregated and apportioned by the fixed percentages called for by the lease. Even though the word "control," as used in the statute, is interpreted to mean stock control, it was clearly not intended to be synonymous with stock ownership. If it were otherwise, there could have been no purpose in using the words "owned or controlled" in the statute. In addition to ownership by the Central Company of 58 per cent. of the stock of the Mahoning Company and the ownership of 75 per cent. of the stock of the Mahoning Company by the Central Company and its stockholders, the Central Company voted through its directors and officials, personally or by proxies executed by stockholders, in excess of 98 per cent. of all the stock voted at the meetings for the years in ques-

tion, which was approximately 82 per cent. of all the stock issued and outstanding. The officers and directors of the Mahoning Company were also officers and directors of the Central Company. It may be argued that those shares not represented at the meetings, and those voted but not owned by the Central Company and its stockholders, constituted a minority which, while quiescent, might become militant if their interests were affected adversely by some proposal of the group in control. But certainly they could not be effective in the matter of control. There were, in fact, no divergent interests here.

In Commissioner of Internal Revenue v. Adolph Hirsch & Co., supra, 43.37 per cent. of the Brazilian Company stockholders owned no stock in the parent company, and the court there said, at page 646 of 30 F.(2d):

"These stockholders would suffer disadvantages and might receive benefits, through the operations of the respondent, in which they have no interest or representation. Thus there is no fair basis of affiliation of ownership, and there is no control of substantially all of the stock by the same interests."

Here the Central Company owned the rolling stock and equipment and operated and maintained the road. The Mahoning Company owned the railroad, and their capital thus invested in a joint enterprise produced earnings out of the common use of such invested capital. It is true that there is no evidence of reciprocal or common ownership in both companies by the so-called outside stockholders of the Mahoning Company, nor is there any right or option in the Central Company to acquire this stock at a fixed price. In other words, it is contended that the Central Company has no beneficial interest in the minority stock of the Mahoning Company.

It seems to me that if *control* means stock ownership *plus* beneficial interest, it is *complete* control. But the statute deems the corporations affiliated if the control is through closely affiliated interests or by a nominee or nominees of "substantially all the stock." It does not require control of all the stock, but such amount as will effectually dominate and render possible adverse outside interests impotent or negligible. This was not an artificial scheme designed to evade income and excess profits tax, but was the result of a business transaction that gradually came to be a single enterprise which, being overtaken by a favorable method of taxation, seeks the benefit thereof. While the government ought not to be deprived of its revenues through unnatural or strained construction of a taxing statute, yet the taxpayer should not be deprived of benefits which flow to it from a favorable and reasonable interpretation of an indefinite and uncertain provision of such law.

I think these corporations were affiliated under the first subdivision of section 240(b) of the Revenue Act of 1918.

█ The second question arises in Case No. 15256, wherein the government seeks to recover of the Mahoning Company a deficiency in taxes for the years 1919 and 1920 based upon additional income received by the Mahoning Company in respect to payments made by the Central Company of income taxes of the Mahoning Company. It is conceded that the payments made by the Central Company were made under mistake of law and that they were voluntarily made without misrepresentation on the part of the Mahoning Company.

The lease of the Mahoning Company's railroad was executed long before the enactment of the income tax laws, and provided as follows:

"That it (the lessee) will in due season pay all taxes and assessments which may be levied or become chargeable on the said road or property, or upon the said Mahoning Company, by reason of its ownership thereof."

For some years the lessee paid the income and excess profits taxes of the Mahoning Company under the belief that the above provision of the lease required it. Any question in that respect was set at rest in Brainard v. New York Central Railroad Co., 242 N. Y. 125, 151 N. E. 152, 45 A. L. R. 751, wherein it was decided that the lease did not require payment by the Central Company of such federal taxes. These payments ceased in 1921. The government does not contest the decision that the Central Company was not obligated to pay the taxes, but asserts that the Mahoning Company is liable for the tax because the money representing its income tax was derived from capital as a gain or profit constituting taxable income. Save for the fact that here there was no valid obligation upon the Central Company as lessee to pay the lessor's income tax, the case might be controlled by Old Colony Trust Co. v. Commissioner of Internal Revenue, 279 U. S. 716, 49 S. Ct. 499, 73 L. Ed. 918, and United States v. Boston & Maine Railroad, 279 U. S. 732, 49 S. Ct. 505, 73 L. Ed. 929.

I am unable to see how the payment of money as taxes for another, through a mistaken notion of an obligation to do so, may be transformed into taxable income derived

from the capital of such other. Although not so deciding, an intentional voluntary payment of the Mahoning Company's taxes, without objection by it, might constitute taxable income as a gain or profit, but certainly a nonobligatory payment of such taxes, made under mistake of law, did not operate to create a gain derived from capital or other gain or profit within the meaning of income, as provided and defined by the Revenue Act of 1918, or by the Supreme Court of the United States in Eisner v. Macomber, 252 U. S. 189, at page 207, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570.

The invested capital of the Mahoning Company did not produce what is here thought to be additional income. It grew entirely out of a misconception of a legal obligation. Any consideration for such payment failed when it was determined that it was not required to be made. The government received all of the tax to which it would have been entitled, if the parties had not erroneously interpreted their legal rights and obligations under the lease.

Judgments may be entered in accordance with these conclusions.