# Pollock's Estate.

148

154

*John F. Headly, Henry P. Erdman* and *Robert T. McCracken,* for Roland D. Pollock.

*Ira Jewell Williams, Jr., A. Carson Simpson* and *Ira Jewell Williams,* for the executors of Margaret Pollock.

GEST, J., May 1, 1931.—The facts of this case appear so fully in the adjudication of the Auditing Judge that it is not necessary to repeat them in detail. Two questions are raised by these exceptions of Roland Pollock and of the executors of Margaret Pollock to the adjudication: First, whether Roland Pollock stood in a fiduciary relation to his mother, Margaret Pollock, in connection with the agreement made between them of February 8, 1923; and if this first question is decided in favor of the executors of Margaret Pollock, the second question arises, to what relief are they entitled?

The majority of the five judges who were present at the argument are of opinion that the exceptions of Roland Pollock relative to the first question should be dismissed. It may be conceded for the purpose of the argument that Roland Pollock was not a technical trustee of the 2370 shares of stock of the Pollock-Huston Company bequeathed by the will of the testator to him under the condition annexed to the bequest, and it may be further conceded that the declaration of the stock dividend was in accordance with sound financial policy. It should be pointed out, however, that, in the absence of a stock dividend, it would probably have been necessary for the corporation to pay a heavy federal tax on the undivided surplus. The action of the son saved the corporation from the tax and in substance transferred this burden to the mother by compelling her to give up her one-half interest in this stock dividend. This large surplus was build up out of the earnings of the business, accruing since the death of the testator. While the widow had no legal right to any of it until the declaration of a dividend, her moral right to a share thereof, potential and inchoate though it was, entitled her to full and complete independent advice before she should be deprived of her share thereof.

It is clear to us that Roland Pollock stood in a confidential relation to his mother, which required from him the exercise of *uberrima fides;* that one-half of the stock dividend, or 1185 shares, belonged to her absolutely under the provisions of the will, which specified "dividends of any kind or nature;" that Roland Pollock failed in his duty by insisting upon his mother waiving her rights to the stock dividend without consideration and without independent advice, and further by stating that the dividend would not be declared unless a gift of it was first made to him. Consequently, he became a trustee *ex maleficio* of the said 1185 shares of stock; and the contract was voidable by her and after her death by her executors. The recital in the will of Mrs. Pollock, as can be seen by reference thereto, of the son's interest in the corporation had reference solely to the provisions of the will of Mr. Pollock. By oral testimony it was attempted to enlarge this reference to cover the alleged gift of the stock dividend; this testimony was ordered stricken out without objection. As the adjudication discusses the facts of the case very fully in this regard, we do not consider it necessary to supplement it, and pass to the second question.

The Auditing Judge surcharged the accountant, Roland D. Pollock, with $162,179.10, as representing the "actual value" of 1185 shares of stock as of March 17, 1923, the date of the declaration of the stock dividend, or approximately $137 per share. In his first adjudication the Auditing Judge awarded the 1185 shares of stock in kind to the executors of Margaret Pollock, and we are of opinion that this was right. The present is a case of a trust arising *ex maleficio*, and a court of equity, which we are, should replace the parties in the positions they occupied before the trust arose.

It is beyond dispute that the stock of the Pollock-Huston Company had never at any time any market value, for the reason that there was no market for it. Had the bequest been of such stock, as, for example, Pennsylvania Railroad, which is bought and sold every day on the exchange, the award of the Auditing Judge might have been correct, but "value" in a case like this means nothing. Sir Edward Coke said, 3 Inst. 105: "Concerning the value (to speak it once for all) *tantum bona valent quantum vendi possunt*," which some one has put into rhyme:

"The real worth of anything
Is just as much as it will bring."

To talk of "actual value," "liquidation value," or the like, is simply to becloud the question and run the risk of doing serious injustice to Roland Pollock. Ordinarily, as the Auditing Judge says, "the option is with the complainant; and if property has been wrongfully taken away, . . . she can have relief in money or kind." But suppose that Mrs. Pollock, immediately after the transaction, had repudiated it and brought suit against Roland Pollock, would any court have awarded her $162,179.10, thus turning the trustee into a purchaser? The court would simply have said: "We cancel the agreement and give you back your stock. You are not entitled to money damages because the thing which was the subject of the agreement had no market value." Margaret Pollock received all the dividends to which she was entitled; she was not damnified in money; she lost the thing, and it should be the object of a court of equity to put the parties in the same position as that which would have been theirs had the transaction not occurred.

In fact, although in this discussion we necessarily speak of stock, yet the stock represented merely an undivided and indivisible interest in the business. Divested of its corporate shell, the Pollock-Huston Company was but a carpet factory, and its value depended for the purposes of this case principally on profits divisible in the form of dividends.

In our opinion, the contract being voidable, the damages, if any be awarded, should be calculated from the date when the contract was repudiated and the executors of Margaret Pollock demanded their rights, so that it was error to calculate them on the basis of value existing in March, 1923. Mrs. Pollock received the share of the dividends to which she was entitled, so that her executors were entitled, at most, to nominal damages, for she suffered no money loss by Roland Pollock's retention of the stock. Consequently, her executors were entitled to have the 1185 shares of stock awarded to them and nothing more.

The exceptions filed by both parties are very numerous, seventy-three being filed by Roland Pollock and twenty-nine by the executors of Margaret Pollock, and need not be disposed of *seriatim*. The exceptions of Roland D. Pollock relative to the first of the above questions are dismissed, and those relating to the second question are sustained. The exceptions filed by the executors of Margaret Pollock are dismissed. The adjudication is amended by striking out the money award to the executors of Margaret Pollock and sub-

stituting in lieu thereof an award to them of 1185 shares of stock of the Pollock-Huston Company.

The Auditing Judge authorizes us to say that he concurs in this modification of his adjudication and award.

STEARNE, J., dissenting.—I am unable to concur in the judgment of the majority of the court. The verbal and written agreement between the mother and son, entered into by the mother with full knowledge and conceded mental capacity—acquiesced in and acted upon by the parties for over six years and until the death of the mother—ought not now to be permitted to be overthrown by beneficiaries under the mother's will and for their own benefit.

The ruling of the Auditing Judge, affirmed by the majority of the court, was that the son was a trustee of the corporate stock in question, and that, therefore, a legal presumption arose that any gift by the *cestui que trust* to the trustee was void and ineffective, and that such presumption was not overcome by a sufficiency of evidence. I have formed the opinion that there was no trust, actual, constructive or *ex maleficio*, concerning the stock in question; that a gift from a parent to a child is presumed to be valid; that a confidential relation existing between a parent and child does not alter the presumption in favor of the validity of a gift. The mother acquiesced in her act for a period of over six years, until her death, and those interested in her estate ought not to be permitted after such lapse of time to overthrow, for their own advantage, what the decedent, with full knowledge, capacity and deliberation, concluded in her lifetime. I would return the present account to the file unaudited; I would treat the case, in the circumstances, as an application to fix the liability, if any, of the son to the mother for any dividends which legally or equitably belong to her or her estate; I would hold, under the evidence, that no such liability had been established and would dismiss the application with costs.

James Pollock, the testator, was a carpet rug manufacturer. He died September 26, 1917, leaving to survive him a widow and three children—a son and two daughters. The widow died February 28, 1929. The son is the present accountant, and against whom the surcharge has been made. The executors of the estate of the deceased widow and the two daughters, individually, as beneficiaries under her will, are the contestants. The father possessed, at the time of his death, 2480 shares of the capital stock of the Pollock-Huston Company, a Pennsylvania manufacturing corporation. The capital consisted of 3000 shares of common stock of the par value of $100 each, a total capitalization of $300,000. Of the remaining 520 shares, ten were owned by the testator's son, Roland D. Pollock, and the rest by individuals, directly or indirectly, associated with decedent in the management of the business. The son was a director and assisted his father in the management of the business.

By the terms of Mr. Pollock's will, 2370 shares were bequeathed to his son, Roland D. Pollock, "upon condition, however, that he shall make payment of one-half of all dividends that may be declared thereon of any kind or nature to my said wife for and during the term of her natural life." Testator divided his remaining 110 shares of stock among his nephews. The balance of the estate, after certain pecuniary bequests, was bequeathed to his son and a trust company, as executors and trustees, in trust to pay one-third of the income derived therefrom to his widow for life, and the rest of such income during said period among his three children and upon the decease of his widow, to divide the principal of the residuary estate among his three children, share and share alike.

An account of the executors of the will of the father was duly filed and was audited by Henderson, J. In his adjudication, Judge Henderson properly

made the award concerning the 2370 shares of stock in the following language: "2370 shares of the capital stock of The Pollock-Huston Company to his son, Roland Dudley Pollock, upon condition, however, that he shall make payment of one-half of all dividends thereon to his, testator's wife, for and during the term of her natural life." In the adjudication it was stated: "By writing hereto annexed, Margaret Pollock, the widow of the testator, requests that the 2370 shares of the capital stock of The Pollock-Huston Company, given by the will to testator's son, Roland Dudley Pollock, upon condition that he shall make payment of one-half of all dividends thereon to his mother, for and during the term of her natural life, be awarded to Roland Dudley Pollock without security. This request is accordingly granted." This waiver of security by Mrs. Pollock is attached to the adjudication. There is also attached a certificate dated October 25, 1917, signed by the son, in which he certifies that he accepts the 2370 shares of said stock, bequeathed to him under the will of his father, and agrees "that I will make payment of one-half of all dividends that may be declared thereon of any kind or nature, to my mother for and during the term of her natural life, and do hereby agree to make such payment accordingly." In accordance with the said adjudication, the 2370 shares of stock were duly assigned and delivered by the executors to Roland D. Pollock, and the same were duly registered in his individual name upon the books of said corporation and new certificates therefor issued to him.

Following the death of Mrs. Pollock in February, 1929, her two daughters, and also the executors under her will, requested the son to file an account relating exclusively to the 2370 shares of stock of the Pollock-Huston Company so bequeathed to him under the father's will. Accordingly, the son filed his account, entitled "First and Final Account of Roland Dudley Pollock, Special Trustee," in which he accounted for 2370 shares of the stock awarded to him under the adjudication. He did not account for any of the shares issued to him as a stock dividend under the circumstances hereinafter related. The account takes credit for payments of all cash dividends made by the son to his mother. It was this account which came before the court for adjudication.

The Auditing Judge ruled: (1) That Roland D. Pollock was a trustee for the 2370 shares of stock so bequeathed to him under his father's will; that his mother, Mrs. Pollock, was a *cestui que trust* as to one-half of all dividends paid or which should have been paid thereon; (2) that because of this fiduciary relation between the mother and son, and under all the circumstances of the case, a burden was cast upon the son to overcome a presumption against him that the gift was free from the taint of actual or constructive fraud; (3) that the son failed to overcome the presumption against him and he was accordingly surcharged with the cash value of the stock dividend from the date of its receipt.

The majority of the court confirmed this ruling, but modified the adjudication by striking out the surcharge of $162,179.10 and awarding to the mother's estate the one-half of the stock dividend in kind.

At the outset the bequest of 2370 shares by James Pollock, the decedent, to his son, upon condition that he pay to his mother one-half of all dividends declared and paid thereon for her life, was not a trust. It was a gift upon condition. This situation is specifically provided for by section twenty-three of the Fiduciaries Act of June 7, 1917, P. L. 447, 489, which reads as follows:

"Whenever any personal property . . . has been or shall hereafter be bequeathed to any person . . . upon a condition or contingency; the executor

or executors . . . shall deliver the property so bequeathed to the person entitled thereto, upon such person giving security in the orphans' court having jurisdiction, in such form and amount as in the judgment of the court will sufficiently secure the interest of the person or persons entitled in remainder."

Section twenty-four of the Fiduciaries Act invests the orphans' court with exclusive jurisdiction for the collection or enforcement of payment or delivery of all legacies.

It would, therefore, clearly appear that when Judge Henderson awarded these 2370 shares of stock to the son, upon condition that he pay to his mother one-half of all dividends declared and paid thereon, the son thereafter owned the stock absolutely. He did not hold it in trust. His obligation was a personal one: to pay his mother one-half of all dividends declared and paid thereon. Should the son fail to comply with the terms of the conditional gift, the mother, having waived the entry of security, could only have proceeded against him in the orphans' court to recover the amount due her. No trust relationship exists. In the case of a life tenant and remainderman, upon entry of security as provided by the twenty-third section of the Fiduciaries Act (or its waiver), the asset becomes the absolute property of the life tenant. It ceases in every way to form part of the decedent's estate. Upon the death of the life tenant, the remainderman must look alone to the estate of the life tenant (or the surety): Reiff's Appeal, 124 Pa. 145; Letterle's Estate, 248 Pa. 95; Weir's Estate, 251 Pa. 499; Kirkpatrick's Estate. 284 Pa. 583; Strawbridge's Estate, 14 D. & C. 703.

Bequests on condition are similarly regarded. See Fleming v. Fleming, 204 Pa. 648, 651, et seq.; Etter & Snyder v. Greenwalt, 98 Pa. 422.

It is undoubtedly true, despite the true legal relationship, that the son, his counsel and the Auditing Judge, regarded the stock as a trust res. But where, in truth and in fact, a trust relationship does not exist, no estoppel, admission, or act by the son, his counsel or the court, can transfer or change an absolute ownership into a trust estate. It is freely admitted that upon such a conditional but absolute gift, this court, under the twenty-fourth section of the Fiduciaries Act, could have enforced against the son a decree to pay to his mother one-half of all dividends which were or which he should have caused to be declared on the stock so conditionally bequeathed to him. This, however, is not by way of enforcing a trust, but obliging the fulfillment of the conditional gift, and which, in a paper annexed to Judge Henderson's adjudication, he promised to perform. I emphasize this legal situation—not because of any rule of practice—but because of its tremendous importance concerning the burden of proof to be borne by the son. If the transaction be regarded as a trust, a barrier is interposed before the gift of the stock dividend to the son which is insuperable. It is practically impossible for a trustee to justify a gift to himself from a *cestui que trust* of part of the trust res. Yet, despite the above decisions and the twenty-third section of the Fiduciaries Act, this is the burden which the Auditing Judge and the majority of the court cast upon the son.

It was clearly error to have treated these shares of stock as a trust res, and for the son to have accounted for the stock as a "special trustee." Under no circumstances ought the transaction be treated as a trust with a trustee, trust res and *cestui que trust,* thereby raising all elements incident to a trust relationship. The true situation in the circumstances between the mother and the son, with respect to this stock, was that of owner and creditor. In my opinion, the account, as such, should not have been audited. No commissions, counsel fees, etc., should have been allowed. The account should have been returned to the clerk's office unaudited.

However, as all the evidence is before the court, I would treat the matter as an application under section twenty-four of the Fiduciaries Act to fix the amount, if any, due by the son to his mother under the conditional gift made to him under the terms of his father's will. Circuity of action and the unnecessary expense and delay of a rehearing under proper procedure is thus avoided.

The Auditing Judge and the majority, with respect to the merits of the case, take the following position: That, irrespective of the true legal situation of the parties, the will of the father gave to the mother one-half of all dividends on the stock bequeathed so to the son; that a stock dividend was declared and paid to the son; that the son failed to give to his mother her one-half share; that the son, therefore, became a trustee *ex maleficio* of the mother's share of stock; that her verbal and written agreement of gift or relinquishment to the son was ineffectual to waive her rights therein because of the trust relationship; that the mother's testamentary beneficiaries, after her death, properly required the son to reimburse his mother's estate for said stock.

The majority refuse to consider the corporate situation as it existed at the time of the execution of the agreement of waiver. The basic reason for the declaration of the stock dividend, its effect and the just and reasonable reaction of the son with respect thereto are wholly rejected.

The majority overlook the underlying plain intent of the gift of the father to the son. In effect, he gave the factory to the son, but directed that the son share all dividends with the mother. It is freely conceded that the son ought not to be permitted to dam up dividends, add them to surplus and then by illegal and improper manipulation deprive the mother from her rightful participation therein. However, in the circumstances of this particular case, it is manifestly unfair to attribute any such intent to the son. Nothing which he has done contributed to such a result. I can readily appreciate that if the son employed accumulated income to enlarge and enhance his factory or to save himself large tax payments, the generosity of his mother ought not to be imposed upon. Yet the plain facts are that the son was interested in maintaining the efficiency and earning capacity of the mill. The mother was quite as interested as the son in seeing to it that the splendid income which she was then enjoying should not be diminished. To employ homely similies: If the cow went dry there would be no more milk. She showed not the slightest indication of desire to kill the goose which laid golden eggs.

The attitude of the majority is reflected in the opinion of the court, where it is stated: "Divested of its corporate shell, the Pollock-Huston Company was but a carpet factory, and its value depended for the purposes of this case principally on profits divisible in the form of dividends."

Of course, while profits either added to surplus or distributed by way of dividends is one element which reflects the real value of corporate stock, yet it is certainly fallacious to say that the value of any corporation principally depends on dividends.

A corporation may be rich in tangible and intangible assets and yet pay no dividends or profits for many years. To preserve the corporation's existence it sometimes becomes necessary (for instance, through style changes or variations in human habits or requirements) to tear down an entire corporate structure and erect quite a different financial fabric and physical equipment. To do this frequently requires the discarding of theretofore valuable machinery and equipment and the substitution of others in its place. After such replacement, frequently the intrinsic or liquidating value of the corporation remains practically unaltered. Such alterations, replacements, additions and repairs do not necessarily enhance the real value of a factory. It is this prin-

ciple which the majority refuses to recognize, and which, under the facts, is most important.

An entirely erroneous conclusion is also placed upon the son's refusal to declare a stock dividend in the circumstances without the waiver from the mother. The majority consider his act as a willful withholding of a legal right and duty which the son owed his mother. The evidence reveals, upon the contrary, that the son and his mother were in perfect accord as to the consumption of the surplus in replacements, and the method of use, by way of a stock dividend, was merely the form which the corporate action assumed.

A careful analysis and consideration of the facts becomes necessary to properly understand and appreciate the situation of the parties and the legal consequences of their acts. These facts are practically undisputed:

The decedent founded this narrow loom carpet rug business in 1867, with a capital of $1500. The widow coöperated with her husband in the establishment of the business and assisted him in the keeping of the books. In 1911, when the business was incorporated, it had a capital of $300,000. Until the very time of her death, the widow continued to be active in her interest in the business. She always kept well informed concerning its condition and management. At the time of testator's death in 1917 the capitalization of the corporation was $300,000, and the surplus amounted to $49,925.95. After Mr. Pollock's death the son became president and was the active manager of the corporation. Customary and moderate dividends continued to be paid to stockholders from 1917 until 1920. Apparently the years 1920, 1922 and 1923 were extraordinarily profitable ones in the history of this business. At the closing of the books on September 30, 1922, despite tremendous increases in overhead, due to increased salaries, insurance, wages and expenses, as well as the declaration and payment of extraordinarily large cash dividends, the surplus amounted to $380,879.93. Mrs. Pollock always shared, and continued to receive until her death, one-half of all the cash dividends which the son received upon all his shares of stock.

At this point, i. e., at the ending of 1922, important changes in policies were under consideration by the directors of the corporation. The character of the carpet rug business was being abruptly changed. What are known as "seamless" rugs were receiving the intensive interest of all carpet rug manufacturers. If such rugs were successfully manufactured it would entirely eliminate the manufacture and sale of the kind of Wilton rugs which this corporation manufactured and marketed. It would render its present business obsolete and worthless. The corporation was not equipped to manufacture such wide seamless rugs. Such a process involved the installation of expensive and complicated machinery known as "wide looms." Such installation, on account of the extremely large size and character of the machinery, would necessitate a tremendous increase in factory space; it also involved the purchasing of additional adjacent land. Reduced to its lowest terms, the corporate problem was this: If nothing was done, the factory would quickly become obsolete, and the business should be immediately liquidated. On the other hand, if the surplus were employed in the improvement-expansion program above outlined, and should the carpet rug business continue to prosper in the future as experience in the past had seemed to indicate that it would, an extremely opulent future for the corporation seemed assured.

All the interested parties, including the widow, after due consideration and deliberation, concluded that the improvement-expansion program was the correct procedure. It was decided that the business should be continued, improved and enlarged.

The next problem was a legal-fiscal one. The direct method would have been the immediate use of the surplus for this agreed purpose. However, at the particular time, viz., 1922-1923, a possible federal income tax assessment on surplus stood in the way. In 1920 the Supreme Court of the United States had decided (Eisner v. Macomber, 252 U. S. 189) that stock dividends were not taxable as income. It is in the testimony, and also is a matter of judicial knowledge, that, following this decision, the taxing authorities of the United States contemplated the taxation of corporation surplus. In fact, in 1924, such an act of Congress did go into effect (Act of June 2, 1924, 43 Stat. at L. 253, ch. 234, § 220; income tax regulations, 65-69). During this period tremendous increases of capital stock of large numbers of corporations throughout the United States were effected, and such surpluses were added, by way of stock dividends, to the capital. This avoided the possibility of an assessment of such a proposed tax, and was regarded by the federal taxing authorities as not being a tax evasion procedure, but within the legitimate province of corporate action. Mr. Erdman, counsel for the corporation (who was also acting as counsel for both the son and mother), advised that the proper procedure was first to add the surplus to the capital, by way of a stock dividend, before embarking upon the improvement-expansion plan. The son was informed and realized that if the surplus were added to the capital, by way of a stock dividend, under his father's will the mother was entitled to one-half of all stock dividends that might be declared upon the 2370 shares of stock given to the son under his father's will. The son was quite willing to share all cash dividends, but declined to give his mother one-half of any stock dividend which might be declared on the 2370 shares. He stated very definitely to his mother that he would not agree to declare such stock dividend unless his mother agreed to relinquish her rights therein. He stated as a reason that otherwise he would be parting with a part ownership in the business, and would thus diminish his control in the corporation. The widow and the son talked over the matter, and agreed that the stock dividend should be declared, that the son should retain all of the stock absolutely, and that the son would continue to pay to his mother one-half of all cash dividends declared, not only upon the original 2370 shares but upon the additional shares which he would receive as a stock dividend. This verbal agreement between the mother and son occurred between the Christmas holidays of 1922 and February 8, 1923. Mr. Erdman, counsel for all parties, talked the matter over with Mrs. Pollock, and was informed by her of this agreement. On February 6, 1923, Mr. Erdman sent to Mrs. Pollock a written agreement reciting the facts and stating that Mrs. Pollock would "probably be entitled to one-half of any stock dividend declared," and recited Mrs. Pollock's intention to give to her son all of the stock dividend which might have been declared, and which agreement effectuated the gift, and had annexed to it the son's agreement to give to his mother one-half of all dividends which he might thereafter receive on the original shares as well as the shares obtained by him by way of stock dividends.

This agreement was mailed to Mrs. Pollock at her apartment in a hotel, with a letter of explanation from Mr. Erdman, and with his suggestion she consider the matter very carefully, and recommended she talk it over with her friends before being executed. Two days later Mrs. Pollock sent for her son and Mr. Erdman, and in their presence the agreement was executed.

At that time, February 8, 1923, Mrs. Pollock was approximately seventy years of age. Her son was thirty-nine. She was in good physical health and was fully conversant with the nature and extent of her act. At this same

meeting Mrs. Pollock gave instructions to Mr. Erdman to prepare her will. In this will she gave the residue of her estate to her two daughters solely, with the explanation "I wish to state that it is not through any lack of affection for my son, Roland, or his family, that I make this disposition of the residue of my estate, but because I feel he has been amply provided for under his father's will, and upon my death will receive the entire benefit of the stock of the Pollock-Huston Company, given to him under his father's will." It is also in the testimony (although subsequently improperly ruled to be incompetent) that it was because of the "making this agreement with Roland about the stock dividends she was giving all the rest of her estate to her two daughters." This will appointed her son, Roland, as sole executor. On February 8, 1927—four years later—Mrs. Pollock executed another will making certain changes, in which she made her daughter, Lillian, her financial adviser and a member of the board of directors of the corporation, Mr. Heston and the Girard Trust Company executors and trustees. Under the seventh paragraph of this will she reiterates and states *verbatim* the same reasons given in her previous will for not providing for her son.

After the execution of the agreement between Mrs. Pollock and her son, the stock dividend was declared, March 17, 1923, and was paid to the son, who thereafter continued to pay his mother from February, 1923, until the date of her death, February, 1929—a period of six years—one-half of all cash dividends declared and paid on the 2370 original shares and upon the shares which he received by way of a stock dividend thereon.

As a matter of interest, but not germane to the decision, after the expenditure of the entire surplus and over $100,000 in addition, the wide looms were not in fact installed; the carpet industry became greatly depressed and unprofitable and the corporation is now in process of liquidation.

What fraud, actual or constructive, exists in the present facts which requires the setting aside of the mother's written agreement? In my opinion, the mother gave up no substantial right or interest. In administering justice under equitable principles, the orphans' court should always look to the substance and not the form.

What were the rights of the widow in this surplus prior to February 8, 1923—the day she executed the agreement? I do not understand that when a corporation accumulates a surplus, the stockholders immediately become seized of a vested interest in such surplus and are entitled to a present distribution thereof. Quite upon the contrary, Mr. Justice Kephart was careful to say (Nirdlinger's Est., 290 Pa. 457, 471, 472) : "Courts in determining rights as between life tenants and remaindermen, do not endeavor to control, manage or direct the internal affairs of a company, nor do they attempt to require that money held as surplus for corporate reasons shall be divided among the members in order that one member shall receive the accumulated earnings."

These directors, as the Auditing Judge finds, in an honest exercise of business judgment, decided upon a change in the company's manufacturing policy. The company concluded to go into the business of manufacturing seamless rugs. This involved the expenditure of the entire surplus and $100,000 in addition. Undoubtedly the directors could, and possibly should, have voted to so expend the corporation surplus. In so doing, it must be remembered with this change of manufacturing policy buildings and machinery theretofore useful and carried on its books as valuable assets would immediately be scrapped, depreciated and rendered obsolete. The new machinery and assets so purchased, and the new buildings so erected, would be placed in the corporation assets as replacements. It must be remembered that the expenditure

of the surplus, under such circumstances, was not merely adding the surplus to the already accumulated capital, thereby increasing the size and productivity of the factory. It was a decision which changed vitally the corporation's policies and financial structure. It is again emphasized that the widow, in full possession of all the facts and knowledge, acquiesced in this change of policy and actively counseled and participated in such expansion and change in the corporate program. Had the corporation acted as above indicated, it cannot be seriously questioned that the widow would have had no legitimate claim to any share in such surplus.

With this honest and legitimate need for the use of the corporate surplus, it was solely to protect the corporation from additional federal income tax assessments that counsel for the corporation advised the transfer of surplus to capital. This was the only reason why the use of the surplus, as above indicated, first took the form of a declaration of a stock dividend. The subsequent Acts of Congress of 1924 and 1926, taxing corporate surplus, justified the soundness of the attorney's advice. Had the corporation expended its surplus for improvements, the directors contemplated that thereafter they might be met with a demand for an additional income tax assessment upon such surplus, and for which they would have no means with which to pay it. It was this consideration, and this alone, which engendered the idea of the declaration of a stock dividend. It is worthy of note, but not decisive of this case, that an examination of the federal tax cases and treasury regulations under the Acts of Congress of 1924 and 1926 will reveal that in the facts in the present case this surplus would not have been taxable, and that in truth and in fact the declaration of a stock dividend saved no corporate taxes whatsoever.

The consideration of such declaration of a stock dividend revealed that under Mr. Pollock's will his widow would be entitled to participate to the extent of one-half of the stock so given to the son. The son immediately disclosed to his mother the results following such method and his objection thereto. With full knowledge of all the facts, and actively desiring the improvement-expansion program to proceed, the mother agreed to waive her rights in the stock dividend. She signed a written agreement with full knowledge and assent, and at the same time omitted the son from her will, although making him her sole executor.

I seriously doubt whether the waiver in the present case amounted to a gift. But, assuming that it is a gift, it is a settled principle of law that the mere existence of the parental relation raises no presumption against the validity of a gift by a parent to a child, and it is not to be presumed that the gift was the result of fraud or undue influence. On the contrary, such a gift being in accordance with the promptings of parental duty and affection, is presumed to be valid, and the burden is on the donor, or those claiming under him, to show that it was not free and voluntary, especially where it does not appear that the gift was improvident: 46 Corpus Juris, 1322, § 152. Undue influence, to invalidate a gift between parent and child, is an unlawful or fraudulent influence which destroys the free agency of the donor and substitutes therefor the will of the donee. The existence of a fiduciary or confidential relation between parent and child, in addition to the family relation, is not necessarily fatal to a gift from the former to the latter: 46 Corpus Juris, 1319, § 142.

The text of the above sections from Corpus Juris is amply supported by our Supreme Court decisions: Carney v. Carney, 196 Pa. 34; Crothers v. Crothers, 149 Pa. 201; Yeager's Estate, 273 Pa. 359; Northern Trust Co. v. Huber, 274 Pa. 329; Leedom v. Palmer, 274 Pa. 22.

While it is true that the son was an executor of his father's will, yet it is also to be noted that he was the only son and was extremely close in the affection of both his father and mother and so continued until their respective deaths; at the time of the execution of the agreement of gift he was made his mother's sole executor. There is no evidence tending to indicate that the mother was exclusively dependent upon her son for business or financial advice. Mr. Heston (her husband's financial adviser and a director of the corporation) apparently directed her fiscal affairs and was subsequently made one of her executors in her last will and testament. The record is absolutely barren of evidence which could be reasonably held to prove, or tend to infer, that the son by any method, directly or indirectly, destroyed his mother's free agency and substituted his own will. The mother was not aged or infirm, but, upon the contrary, was in good health and mental vigor; she lived alone in a city hotel, made frequent trips abroad, both alone and with her grandchildren, and was fully informed concerning all the details of the business. Mrs. Pollock, with her husband, had founded the business, had assisted him in keeping the business books and had always kept fully informed and was thoroughly familiar with all of the corporation's affairs; it is not charged that anything was ever concealed from her; she made her agreement with her son in full possession of all her faculties and with full knowledge of all the facts.

It is true that Mr. Erdman, a highly reputable member of the Philadelphia Bar, represented all parties and consequently, in the circumstances, was unquestionably serving adverse interests. Yet, for the reason hereinafter narrated, I cannot feel that this action was improper, reprehensible or unethical. He merely put in writing what the parties themselves had already agreed upon; he mailed the agreement to the mother, and even suggested care be exercised in signing it and recommended that she talk it over with her friends. Mrs. Pollock kept the agreement for two days, and it was she who sent for Mr. Erdman and her son and then voluntarily executed it. At the time Mrs. Pollock executed the agreement she realized that she was favoring her son as against her two daughters, which, of course, she was at perfect liberty to do. There is testimony (hereinbefore referred to) that it was because of the execution of this agreement that she was making a will in the manner that she was about to instruct her attorney. She gave instructions to Mr. Erdman at this time to draw her will. According to the terms thereof, she recited that because of the gift of the stock to her son by the husband and in view of the fact that at her death he, the son, "will receive the entire benefit" of said stock, that she leaves her entire estate to her two daughters to the exclusion of the son. She carefully states that she does this through no lack of affection for her son, and the son is appointed her sole executor. It is worthy of note that four years later, when Mrs. Pollock made a new will, these identical statements were reiterated.

I am, therefore, of opinion that, under all the circumstances of the case, the son really did nothing to the disadvantage of his mother. The transaction as to the 2370 shares of stock was not a trust; whatever confidential relationship existed between the mother and the son, it was not involved in the son's ownership of 2370 shares of the stock in question; the son has fully met and overcome, by undisputed evidence, all presumptions, if any, which may be held to exist against the bona fides of the transaction; the son acquired a legal and absolute title to all of the shares of the stock dividend declared upon the 2370 shares so conditionally bequeathed to him under the terms of the will of his father.

And finally: Contestants stand in no higher position then did Mrs. Pollock in her lifetime. She made this agreement in full health and mental vigor on

February 8, 1923. She lived for over six years thereafter, and died February 28, 1929. During all of these years she made no claims or demands upon her son respecting whatever rights she might have had in the stock dividend; upon the contrary, she acquiesced in the arrangements and agreements that she had made with the son; she omitted her son from participating in her estate because of the agreement; the son continued to pay her one-half of all cash dividends declared or paid upon all the stock which he held so derived from his father, and on the stock dividend declared thereon. Certainly, after Mrs. Pollock's death, her personal representatives and beneficiaries under her will ought not to be permitted to maintain a claim which she failed to make—or did not choose to make—in her lifetime. See Mitcheson's Estate, 15 Phila. 605; Bispham's Estate, 8 D. & C. 556; Deardorff's Appeal, 6 Watts, 159; Priestley's Appeal, 127 Pa. 420.

I would sustain Roland D. Pollock's exceptions Nos. 1, 2, 72 and 73 against the action of the Auditing Judge in surcharging him with the value of 1185 shares of the stock of the Pollock-Huston Company, as of March 17, 1923, of the value of $162,179.10. I would declare that Roland D. Pollock was legally entitled to the entire stock dividend declared upon the 2370 shares declared on March 17, 1923, pursuant to the agreement between Roland D. Pollock and his mother, dated February 8, 1923; I would hold that the account herein filed is improperly filed and stated, and would direct that it should be returned to the files unaudited; that all of the costs and legal charges incident to the audit should be charged against the contestants, and I would dismiss all other exceptions.

SINKLER, J., joins in the above dissent.