## UNITED STATES v. DAKOTA TRACTOR & EQUIPMENT CO.

### No. 12014.

Circuit Court of Appeals, Eighth Circuit.

Jan. 7, 1942.

Rehearing Denied Feb. 3, 1942.

Benjamin M. Brodsky, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Carleton Fox and Arthur L. Jacobs,

Sp. Assts. to the Atty. Gen., and P. W. Lanier, U. S. Atty., and Mart R. Vogel, Asst. U. S. Atty., both of Fargo, N. D., on the brief), for appellant.

E. T. Conmy, of Fargo, N. D. for appellee.

Before STONE, WOODROUGH, and JOHNSEN, Circuit Judges.

STONE, Circuit Judge.

This is an appeal by the United States from a judgment according a tax refund based upon allowance of a credit in the computation of the surtax on undistributed profits, under Section 26(c) (1) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev. Acts, page 836, claimed by appellee in its tax return for 1936, rejected by the Commissioner and paid by appellee.

The Act provides for stated surtaxes on defined percentages of undistributed corporate net income, Section 14(b), 49 Stat. 1648, 1656, 26 U.S.C.A. Int.Rev.Acts, page 823. Section 26, 49 Stat. 1648, 1664, provides for allowable credits in estimation of liability for such surtaxes. The here applicable portion of Section 26 is subsection (c) (1), which is as follows:

"(c) Contracts Restricting Payment of Dividends.

"(1) Prohibition on payment of dividends. An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. If a corporation would be entitled to a credit under this paragraph because of a contract provision and also to one or more credits because of other contract provisions, only the largest of such credits shall be allowed, and for such purpose if two or more credits are equal in amount only one shall be taken into account."

The trial court determined that appellee came within this subsection because of a restrictive contract on payment of dividends set forth in a letter of May 13, 1935,[1]

---

[1] The entire letter is as follows:

"May 13, 1935.

Caterpillar Tractor Co.,
Peoria, Illinois.

Attention: Sales and Credit Departments.

Gentlemen:

In applying again for a distributor's agreement covering the territory comprising the entire State of North Dakota, or the major portion thereof, and withdrawing from that portion of Minnesota now included in our territory, the following is set forth as steps which shall be taken if the application is favorably passed upon and the new agreement signed:

1. The name of the Grand Forks Tractor & Equipment Co. will be changed to the extent that the words 'Grand Forks' will be dropped and a more suitable designation be substituted therefor.

2. The principal place of business of the company will be located at Fargo, North Dakota.

3. The authorized capital stock of the company will be increased from $50,000.00 to $100,000.00 as promptly as possible.

4. The present paid-in capital of the company represented by outstanding capital stock is $25,000.00 and the approximate amount in the surplus account is $41,000.00, making the net worth of the company about $66,000.00.

5. Through the declaration of stock dividends or other satisfactory means the present surplus will be converted to paid-in capital stock of the company so that the outstanding capital stock will be increased to $65,000.00.

6. Within thirty days after date of the new General Agreement with Caterpillar Tractor Co. an additional $10,000.00 now available in cash will be invested in the business and capital stock issued therefor, bringing the paid-in capital stock to $75,000.00.

7. It is recognized that a man qualified to supervise the accounting and inside work of the organization is needed by this business and would be a valuable adjunct to us. If arrangements can be made by Mr. George Rinck whereby he will join the firm as an active member, he will be employed and some arrangements to permit him to acquire stock in the company will be made, such arrangements to be concluded on a basis that will be mutually satisfactory to Messrs. Rinck and E. A. King.

8. In the event Mr. Rinck cannot be obtained as an employee in this business steps will be taken to acquire as promptly as possible and in any event within the next several months a man of similar experience and ability for this task.

9. It will be the intention of the company to operate in an economical manner so as to give Caterpillar Tractor Co. satisfactory sales and service representation and to provide satisfactory profit for the business which will in time enable the

the immediately pertinent portion being as follows:

"4. The present paid-in capital of the company represented by outstanding capital stock is $25,000.00 and the approximate amount in the surplus account is $41,000.00, making the net worth of the company about $66,000.00.

"5. Through the declaration of stock dividends or other satisfactory means the present surplus will be converted to paid-in capital stock of the company so that the outstanding capital stock will be increased to $65,000.00.

\* \* \*

"All profits shall remain in the business and from time to time the earned surplus will be converted into paid-in capital through the declaration of stock dividends or otherwise.

"As there is no desire to adversely affect the financial position of the company there shall be no cash withdrawals from the business in the form of cash dividends or otherwise until entire authorized capital stock of $100,000.00 has been paid in.

"As it is the desire of the company to become financially self-sustaining, and to operate the business in a manner that will meet the requirements of all of the manufacturers represented, particularly Caterpillar Tractor Co., the approval of Caterpillar Tractor Co. will be obtained before any cash is withdrawn from the business, even after the authorized capital of $100,000.00 is paid in, unless at such time the business is actually

fully self-sufficient financially and does not owe any money to Caterpillar Tractor Co.

"If the volume of the business engendered shall justify increase of the net worth of the business above $100,000.00, as it is expected will be the case, the authorized capital stock shall later be increased from time to time as may seem to be advisable and further earnings or additional cash be invested in the business and capital stock issued therefor until such time as the business becomes fully self-sufficient financially."

Appellant presents here three matters as follows: (1) The above letter was inadmissible as evidence of a contract, (2) the letter was not a contractual promise but a statement of business policy, (3) dividends could have been distributed without violation of the alleged contract in the letter.

To understand and determine these issues, facts revealing the place of this letter in the business situation of which it was a part must be stated. Taxpayer is a corporation of which E. A. King is president and owner of about eighty-three percent of the stock. It was located at Grand Forks, North Dakota, and, prior and into 1935, had been handling the products of the Caterpillar Tractor Co. (a California corporation) under a contract giving it rights of purchase of such products and of resale in a designated territory. For about a year prior to May 13, 1935, taxpayer had been negotiating with Caterpillar for an enlargement of its territory. The Sales Department of Caterpillar readily agreed to such enlarge-

---

company to become financially self-sustaining.

Cash withdrawals from the business in the form of salaries paid to the principals shall not be excessive but instead shall be kept to an amount required to meet reasonable living expenses until such a time as no sum shall be due Caterpillar Tractor Co.

All profits shall remain in the business and from time to time the earned surplus will be converted into paid-in capital through the declaration of stock dividends or otherwise.

As there is no desire to adversely affect the financial position of the company there shall be no cash withdrawals from the business in the form of cash dividends or otherwise until entire authorized capital stock of $100,000.00 has been paid in.

As it is the desire of the company to become financially self-sustaining, and to operate the business in a manner that

will meet the requirements of all of the manufacturers represented, particularly Caterpillar Tractor Co., the approval of Caterpillar Tractor Co. will be obtained before any cash is withdrawn from the business, even after the authorized capital of $100,000.00 is paid in, unless at such time the business is actually fully self-sufficient financially and does not owe any money to Caterpillar Tractor Co.

If the volume of the business engendered shall justify increase of the net worth of the business above $100,000.00, as it is expected will be the case, the authorized capital stock shall later be increased from time to time as may seem to be advisable and further earnings or additional cash be invested in the business and capital stock issued therefor until such time as the business becomes fully self-sufficient financially.

"Grand Forks Tractor &
Equipment Co.,
"By E.A. King, President."

ment but the treasurer thereof objected because taxpayer did not have sufficient capital. At that time, taxpayer had paid in capital of $25,000 and surplus of about $41,000. The position of Caterpillar was that "additional capital, uninterested capital" should be gotten in, while King objected to uninterested capital because he felt that would not be to the best interests of the taxpayer. After about a year of negotiations, the parties reached an understanding as to this financial status which was embodied in the above letter. This letter was drawn up by the "treasury department" of Caterpillar and signed by King. The execution of this letter was required by Caterpillar before it would make a contract for the enlarged territory.

May 27, 1935, the contract for the enlarged territory was executed by both parties. This contract differed from the earlier one only in definition of territory.

(1) Admissibility of Letter.

(2) Letter as a Contract.

Appellant contends that the letter was inadmissible as a "violation of the parol evidence rule" because it constituted a variation of the terms of the later contract of May 27, 1935. The particular terms of the contract intended are as follows:

"No Other Agreements.

"43. The stipulation of this agreement have been read by both parties hereto; there are no agreements or understandings either oral, or written or otherwise, which in any manner alter, enlarge, abridge or conflict with the terms of this agreement; no departure from the terms of this agreement shall obligate The Manufacturer to permit any subsequent departure; no waiver by either party of any of the terms hereof or of a breach of any provisions hereof shall be deemed to be a waiver thereafter of any such terms or of any succeeding breach; this agreement cannot be altered, enlarged or abridged except by a writing duly signed by The Distributor and by an officer of The Manufacturer, and specified therein to be an amendment hereof and attached hereto; no addition to or erasure in the printed portion of this agreement shall be binding upon either party.

"44. This agreement supersedes any agreement concerning The Distributor's Service Territory or any portion thereof heretofore entered into between the parties hereto. If any rights given to The Distributor hereunder conflict in any way with

the rights heretofore granted by The Manufacturer, the rights of The Distributor shall not become effective until the termination of the conflicting rights."

Appellant argues that the letter violates the just quoted terms of the contract because it varies and adds to the terms of that contract and such variation and addition are prohibited by the quoted provisions.

The position of appellee is that the letter is an unilateral contract not changing or conflicting with the later contract but being part of the consideration for the later contract. In view of these two opposed contentions, both of the above issues depend upon whether the letter is an unilateral contract.

Appellant contends the letter is not a statement of the terms of a unilateral contract but is merely a statement of "business policy" which appellee intended to pursue. It seems clear that the letter is a statement of the terms of a proposed unilateral contract which became binding when the later contract was executed. Both the testimony as to what brought about the letter and also the terms of the letter itself are convincing.

The undisputed evidence (by King and by the assistant treasurer of Caterpillar) is that for about a year Caterpillar would not enter a contract for enlarged territory because of the capital status of the taxpayer; that, except for the arrangement set forth in the letter, Caterpillar would have made no contract for enlarged territory; that Caterpillar drew up the letter to contain the assurance it deemed necessary; and that it was because of such arrangement that Caterpillar executed the contract for enlarged territory, shortly after obtaining the letter. This position of Caterpillar had nothing to do with the terms or conditions of the later contract but everything to do with whether such a contract would be made. The status of the letter is clearly stated in the evidence of the assistant-treasurer of Caterpillar as follows:

"Q. Do you remember, Mr. McKinley, an occasion when Mr. King visited your offices in Peoria, Illinois, on or about May 13, in 1935? A. I do.

"Q. And there were conferences there, were there not, between you and he and others of your Corporation relative to a contract including additional territory which he was desirous of having? A. Yes, sir.

"Q. And as the result of those conversations was there a letter dictated by you

or some of the officers of your Company as to what you would require of Mr. King before you would execute such a contract? A. Yes, sir. * * *

"Q. State whether or not, Mr. McKinley, the execution of the letter of May 13, 1935, was a condition precedent that you required Mr. King to execute before you would give him the distributor's contract? * * * A. It was."

■ The statements in the letter are equally clear. The first paragraph of the letter states that the undertakings set forth therein are in connection with "applying again for a distributor's agreement covering" described territory; that "the following is set forth as steps which *shall be taken*" (italics added)—thus clearly stating the obligatory character of the promises; and that such promises are to become obligatory "if the application is favorably passed upon and the new agreement signed." This paragraph is a classical instance of an offer for a unilateral contract. It states the obligations to be incurred by the offerer and the acts of the offeree which will convert the offer into a contract. Those "acts" were here favorable action on the application for a certain distributor's contract and the signing of such contract. Those acts were fully performed by the offeree while the offer was alive. The letter was then and thus ripened from an offer into a contract, the obligations of which were set forth therein. 12 Am.Jur., p. 537, Sec. 43.

(3) Dividends Were Distributable without Violating Contract in the Letter.

■ Appellee challenges the right of appellant to present this issue because it was not raised in the trial court. Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L. Ed. 1037 (Helvering v. Hormel, 8 Cir., 111 F.2d 1, this Court) rules otherwise. We consider the merits of this contention.

■ This contention is based upon two arguments. One is that the taxpayer was free (under the express terms thereof) to terminate the distributor's contract with Caterpillar at any time and also that there was no showing that the taxpayer could not have secured the consent of Caterpillar to pay dividends. The thought is that the taxpayer might have changed his status by abrogating a desirable business contract or by securing consent of the other party to an act in violation of the contract. It is rather naive to contend that a taxpayer is

liable for a tax if he has power to change a business status so that he would be liable— even though he does not so do. There is here no creation of a business status for the purpose of evading or avoiding taxation. This tax Act is based upon situations as they actually and honestly exist not as they might have been but were not.

The second argument is that the contract-letter restricted payment only of *cash* dividends and expressly allowed stock dividends and required all earned surplus to be converted into "paid-in capital"; that Sec. 26(c) (1) of the Act, permitting the credit, does not apply unless payment of all manner of dividends is restricted; and that, therefore, the situation here is not within the section.

The income here involved is that for 1936. Helvering v. Northwest Steel Mills, 311 U.S. 46, 53, 61 S.Ct. 109, 85 L.Ed. 29. As to the earnings of this taxpayer for that year, the letter-contract requirements are that:

"All profits shall remain in the business and from time to time the earned surplus will be converted into paid-in capital through the declaration of stock dividends or otherwise.

"As there is no desire to adversely affect the financial position of the company there shall be no cash withdrawals from the business in the form of cash dividends or otherwise until entire authorized capital stock of $100,000.00 has been paid in."

The meaning of these provisions is clearly that no net income is to be taken from the corporation but that all "earned surplus" shall be "converted into paid-in capital * * [by] stock dividends or otherwise" until an authorized capital of $100,-000. has been paid in. No statutory provisions of North Dakota are cited which would permit capital increases except for stock issued and it is difficult to see how such could be otherwise done. Therefore, the situation created by these contract provisions is that stock dividends are required and cash dividends prohibited.

■ Thus the question here is whether a contract prohibiting cash dividends but permitting—even requiring—stock dividends is the kind of restrictive contract intended by Section 26(c) (1) as entitling the corporation to the credit provided for therein. This is, of course, a matter of statutory construction. The

approach to such construction is that the burden is upon the taxpayer to show clearly that it is entitled to the credit (White v. United States, 305 U.S. 281, 292, 59 S.Ct. 179, 83 L.Ed. 172; Helvering v. Moloney Elec. Co., 8 Cir., 120 F.2d 617, 620) and that such exemptions are strictly construed (Helvering v. Northwest Steel Mills, 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29).

Appellant supports its contention with three lines of argument: (1) Treasury Regulations 94 (1936 Ed.) Art. 26-2 (b) (1); (2) the legislative purpose; (3) the effect of Section 27 of the Act, 26 U.S.C.A. Int.Rev.Acts, page 837, as in pari materia. The opposed argument of appellee seems to be that stock dividends do not increase the interest of the several stockholders in the corporation and its property nor remove assets from the corporation and, therefore, are not within the definition of dividend as intended by the Act. We pass over the Treasury Regulation because, although its influence is persuasive, yet a departmental construction cannot control but must be within the meaning of an Act.

The two other lines of argument may be discussed together. The obvious purpose of the surtaxes on undistributed profits of corporations was, primarily, to eliminate the avoidance of surtaxes on stockholders through accumulation of corporate earnings instead of normal distribution in cash dividends. As to such provisions of the Act, the concern of Congress was to obtain the taxes from stockholders which would be due from a normal distribution of dividends. Otherwise, it was not concerned with corporation surpluses. It knew there was a practice in some corporations of limiting such distribution for the purpose of lessening surtaxes on incomes of individual stockholders. Hence these provisions taxing undistributed surpluses. In so doing, Congress recognized the actuality that there were instances where there existed situations of corporations which could not make such distribution because of contracts not to do so, which had no relation to taxation. To take care of this, it provided this "credit"—in effect a pro tanto exemption —from this tax.

The restrictions of this credit are carefully confined [2] and must be strictly construed against a taxpayer claiming such credit (Northwest Mills and Moloney Electric Company cases, supra). Therefore, we must so construe the word "dividends" (prohibited by contract and thus entitling to credit) in the narrowest reasonable sense, allowable under the Act, against the taxpayer.

Section 26 does not define "dividends" but Section 27 does "for the purposes of this title", sec. 27(a), which includes Section 26. That these two sections are in pari materia is properly conceded by appellee. Section 26 deals with credits where dividends are not paid. Section 27, with "dividends paid credit." Section 27 sets forth, in detail, the possible different forms of dividends and carefully states, as to each kind, whether credit is allowable or not. The clear result of such provisions in Section 27 is that if the paid dividend is in a form that it will be taxable to the receiving stockholder, it is allowable as a credit to the corporation, while if it is not so taxable, it is not allowable as a credit to the corporation. Not only is this the general result of the section, but there are specific directions as to stock dividends, where the same distinction appears, sec. 27(e), (g) and (h)—that is, if the form of the paid stock dividend is such that it is taxable in the hands of the receiving stockholder it is an allowable credit to the corporation; if not that kind, it is not so allowable. The result is that if a stock dividend, not taxable to receiving stockholders, is made from corporate surplus the amount thereof remains taxable to the corporation.

To hold that a contract which prohibits cash or property dividends but allows—even though it does not, as here, require—stock dividends would relieve the corporation from such item of taxation would be to construe 26(c) (1) in a way utterly inconsistent with 27(h). The actual situation here excellently illustrates this effect. Here appellee was obligated to declare stock dividends and did so by issue (in 1936) of ordinary common stock. This stock was not taxable as income to receiving stockholders. Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521,

---

[2] See limitations in last sentence of 26 (c) (1) and in 26(c) (3).

9 A.L.R. 1570. Under 27(h) this issue could not be a "dividends paid credit." Can it be a credit under 26(c) (1) because it was required—or even permitted —by a contract? The only way this anomaly can be avoided and the purposes of 26(c) (1) effectuated is to construe that section as meaning that the contract intended therein as a basis for a credit is effective therefor only to the extent that it prohibits payment of any kind or form of dividend from surplus. Since this contract-letter prohibited payments only of dividends in the form of cash or property, it falls short of the requirements of 26(c) (1) and can be no basis for the credit allowed thereby.

The judgment should be and is reversed.