## ELLIOTT ADDRESSING MACH. CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 3774.

Circuit Court of Appeals, First Circuit.

Nov. 27, 1942.

Lawrence E. Green, of Boston, Mass. (Wilfred H. Smart and George E. Ray, both of Boston, Mass., of counsel), for petitioner.

Joseph M. Jones, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, J. Louis Monarch, and Arthur A. Armstrong, Sp. Assts. to Atty. Gen., and J. P. Wenchel, Chief Counsel, and J. M. Morawski, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for Commissioner of Internal Revenue.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

This is an appeal from a decision of the Board of Tax Appeals sustaining a determination by the Commissioner of Internal Revenue of deficiencies in the income tax of the Elliott Addressing Machine Company, a Massachusetts corporation, in the amounts of $11,659.48 for 1936 and $5,386.62 for 1937. The petitioner claimed that it was entitled to the undistributed profits surtax credits under Section 26(c) (1) and (2) of the Revenue Act of 1936, 49 Stat. 1648, 26 U.S.C.A. Int.Rev.Acts, page 835, in the amounts of $66,361.25 and $34,357.33 for the years 1936 and 1937 respectively. These sums represent amounts paid by the corporation for certain second preferred shares of stock owned by Harmon P. Elliott, president of the petitioner. The Board decided that Section 26(c) (2) is inapplicable to the facts in this case and the petitioner has not appealed from this holding. It contends, however, that it is entitled to a credit under Section 26(c) (1).[1]

The parties in this case are in substantial agreement as to the facts which may be briefly stated as follows:

· Harmon P. Elliott in 1928 was the owner of more than 80% of the common stock and more than 60% of the second preferred. He had loaned the corporation $666,700 so that it might purchase the assets of the Rapid Addressing Machine Com-

---

[1] "§ 26. Credits of Corporations

"In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\*  \*  \*  \*  \*

"(c) Contracts Restricting Payment of Dividends.

"(1) Prohibition on payment of dividends. An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. If a corporation would be entitled to a credit under this paragraph because of a contract provision and also to one or more credits because of other contract provisions, only the largest of such credits shall be allowed, and for such purpose if two or more credits are equal in amount only one shall be taken into account."

pany and the petitioner in return agreed to give him a demand note. This arrangement was subsequently changed and on April 25, 1928, the petitioner entered into a contract with Elliott in which it agreed to pay him $350,000 in cash and to issue to him 2839 of its 7% second preferred shares of the par value of $100 each. It further agreed to purchase the 2839 second preferred shares "from time to time as rapidly as its earnings or other funds permit, having due regard for the general financial condition of the Company and the necessities of its business" and the agreement provided further "that no such purchase shall be made when any default exists with respect to any of the provisions or undertakings relating to the Company's [first] preferred stock or when such purchase would result in any breach of the Company's undertakings relative thereto".

This agreement was amended on May 5, 1932, by a contract in which the company "agreed that after all dividends and provisions of the first Preferred Stock issue have been paid * * * the Balance of the 2839 Shares of 2nd Preferred Stock covered by the agreement dated April 25, 1928, are to be purchased as quickly as possible with whatever cash is available from the annual net earnings of the Company before paying any dividends other than first preferred dividends but without unduly weakening the Company's financial position."

In 1934, the holders of the first preferred stock expressed dissatisfaction with the action of the petitioner in paying to Elliott during 1929 through 1932 at different times the sums of about $142,000 without their knowledge or consent. They demanded that these sums be returned to the company. In order to settle this controversy amicably a resolution was passed at a special meeting of the stockholders amending the charter certificate. The resolution provided in part that: "(2) Until all of the preferred shares shall have been redeemed no second preferred shares shall be redeemed or purchased by the corporation other than the said 381 second preferred shares and other than the 2439 second preferred shares still outstanding which were issued to Harmon P. Elliott under the existing contract between him and the company dated April 25, 1928. That of the said 2439 second preferred shares 120 second preferred shares shall be redeemed

or purchased from Harmon P. Elliott in each calendar year at par plus accrued and accumulated dividends whether earned or not, but the balance of the said 2439 second preferred shares over and above the 120 second preferred shares to be redeemed or purchased in each calendar year shall be redeemed or purchased by the corporation pursuant to the said contract only as rapidly as the earnings or other funds of the corporation permit, having due regard for the general financial condition of the corporation and the necessities of its business and so that no such redemption or purchase of the said balance shall be made when any default exists with respect to any of the foregoing provisions or undertakings relating to the preferred shares or when such redemption or purchase would result in any breach thereof or unless all dividends accumulated and unpaid upon the preferred shares in previous years, if any, whether earned or not, and for a proportionate part of the current year shall have been declared, set apart and made payable and all sinking fund requirements shall have been fully complied with."

The statement relating to the 381 second preferred shares in the charter amendment is a reference to the corporation's obligation to Elliott to purchase said shares as a balance of the 1410 second preferred shares given to him in addition to the original 2839 shares in return for his loan to the corporation so that it might purchase the assets of the Stimson Investment Corporation.

The Board Member stated in his memorandum opinion that "Section 26(c) (1) is likewise inapplicable, for, although the 1932 amendment of the contract contingently requires the use of available earnings for redemption of Elliott's second preferred shares 'before paying any dividends other than first preferred dividends', a requirement to use earnings to purchase outstanding shares does not fit the section". Respondent interprets this to mean that the Board Member was of the opinion that an arrangement whereby shares of stock are to be purchased from a shareholder of the corporation is not within this section of the statute despite the fact that the arrangement was incorporated in a separate contract. The respondent does not find it necessary to go as far as the Board Member on this point but rather claims that the charter amendment of 1934 superseded the

contract of 1928 as supplemented by the agreement of 1932, and that, therefore, no deduction is allowable.

The view we take of the case makes it unnecessary to consider the Board's position. We agree with the respondent that the charter amendment of 1934 superseded the earlier contracts. From our reading of Helvering v. Northwest Steel Mills, 311 U.S. 46, 61 S.Ct. 109, 85 L.Ed. 29, we are of the opinion that the court intended to go farther than the specific facts in that case and that it excluded charter provisions from Section 26 (c) (1). As the court said, pages 50, 51 of 311 U.S., page 112 of 61 S.Ct., 85 L.Ed. 29: "It is true, as respondent contends, that a charter has been judicially considered to be a contract insofar as it grants rights, properties, privileges and franchises. To this extent it has been said that an act of incorporation is a contract between the state and the stockholders. But it does not follow that Congress intended to include corporate charters and related state laws in the cautiously limited area permissible for tax credits and deductions under this section."

We are in accord with the reasoning in Warren Telephone Company v. Commissioner, 6 Cir., 1942, 128 F.2d 503, and Metal Specialty Company v. Commissioner, 6 Cir., 1942, 128 F.2d 259, on this point.

The 1928 contract provided, as we have stated, for the payment of first preferred dividends and thereafter for the purchase of Elliott's second preferred shares as rapidly as *"its earnings or other funds permit"*. The 1932 amendment provided for the payment of dividends of the first preferred and thereafter for the purchase of the balance of the 2839 shares of the second preferred stock "from the annual net earnings of the company before paying any dividends other than first preferred dividends". This agreement amended and ratified the 1928 contract. It is to be observed that the purchase of second preferred stock was to be made only from annual net earnings. The 1934 charter amendment modifies the 1932 agreement, which was then in force, in two substantial respects. It provides for the purchase of 120 shares of second preferred stock from Elliott regardless of net earnings or other funds and for the purchase of the balance remaining out of earnings or other funds. The charter amendment of 1934 incorporates in substance the important provisions of the earlier agreements and by reference to the earlier con-

tracts all of Elliott's rights are embodied therein. The fact that the corporation must purchase annually 120 shares of second preferred stock from Elliott regardless of its earnings even before the payment of dividends on first preferred is an enlargement of his rights against the corporation.

The argument is made by the petitioner in its reply brief that while it is true that Elliott owned a large portion of the corporation's common and second preferred stock, nevertheless, the corporate entity should not be disregarded. The petitioner suggests that we should treat the charter amendment as a change involving solely the corporation's position as regards the purchase of Elliott's second preferred stock but as in no way affecting his rights under the contracts. We are asked to consider the action of the corporation as unilateral and to ignore the fact that Elliott participated in the necessary proceedings to amend the charter. We cannot overlook the inescapable facts that Elliott was president and owner of a majority of common and second preferred stock of the corporation at that time and that without his concurrence no charter amendment could have been passed. To argue that he can ignore the proceedings to which he was a party is to fly in the face of fact. It is clear that Elliott was satisfied that the 1934 charter amendment adequately stated his rights against the corporation, and we do not believe that the first preferred stockholders who in a letter to the Board of Directors of the corporation stating that they were of the opinion that the purchases of Elliott's second preferred stock were illegal, considered that they were consenting to a futile charter change in so far as his rights were concerned. A significant fact which buttresses our conclusion is that purchases of second preferred stock made subsequent to 1934 were in accordance with the charter provisions. Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A. L.R. 1570; Dalton v. Bowers, 287 U.S. 404, 53 S.Ct. 505, 77 L.Ed. 389, and Burnet v. Clark, 287 U.S. 410, 53 S.Ct. 207, 77 L. Ed. 397, cited by petitioner in support of its contention are not in point.

In one respect this case is different from Metal Specialty Co. v. Commissioner, supra. In that case only a charter was involved. Here the charter amendment was preceded by valid contracts between Elliott and the corporation. We thus have a charter provision which covers certain matters

contained in the earlier contracts and includes in it certain matters not contained therein. Even if we were to say that the charter amendment of 1934 did not entirely supersede the original contracts, it cannot be denied that to the extent the charter amendment fundamentally changes the contracts, reliance must be placed upon it. Under the language of Helvering v. Northwest Steel Mills, supra, and the two cases which we have cited in its support, we find no justification in drawing a distinction between those cases involving merely a charter provision and the case at bar.

The decision of the Board of Tax Appeals is affirmed.